**[ORAL ARGUMENT NOT SCHEDULED]**

**No. 13-1198**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

**JAMES HARRY GRIER, et al.,**

**Petitioners,**

**v.**

**UNITED STATES DEPARTMENT OF
HOUSING & URBAN DEVELOPMENT,**

**Respondent.**

_____

**ON PETITION FOR REVIEW OF AN ORDER OF THE
UNITED STATES DEPARTMENT OF
HOUSING & URBAN DEVELOPMENT**

_____

**CORRECTED BRIEF FOR RESPONDENT**

_____

*Of Counsel:*                                    **STUART F. DELERY**
                                                   *Assistant Attorney General*

**ANA FABREGAS**                            **MICHAEL JAY SINGER**
  *Senior Trial Attorney*                        *(202) 514-5432*
  *U.S. Department of Housing*              **IMRAN R. ZAIDI**
  *and Urban Development*                      *(202) 305-4241*
  *451 Seventh St. S.W.*                        *Attorneys, Appellate Staff*
  *Washington D.C. 20410*                      *Civil Division, Room 7209*
                                                   *U.S. Department of Justice*
                                                   *950 Pennsylvania Ave., NW*
                                                   *Washington, D.C. 20530*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

### A.   **Parties and Amici.**

Petitioners in this case are Mantua Gardens East, Inc., a non-profit corporation, and its president and board chairman, James H. Grier. Respondent is the United States Department of Housing and Urban Development.

### B.   **Rulings Under Review**.

The ruling under review is the May 28, 2013 decision of Secretarial Designee Brent Coburn of the United States Department of Housing and Urban Development.

### C.   **Related Cases**.

The government is aware of no related cases within the meaning of Circuit Rule 28(d)(1)(C).

  s/ Imran Zaidi
Imran Zaidi

## TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED
   CASES

JURISDICTIONAL STATEMENT.........................................................................1

STATEMENT OF THE ISSUES ...........................................................................2

PERTINENT STATUTES AND REGULATIONS...............................................3

STATEMENT OF THE CASE ..............................................................................3

   I.     Statutory Background .........................................................................3

   II.    Factual Background...........................................................................7

        A.  Section 236 Program...........................................................8

           1.  The original mortgage and other loans....................................8

           2.  Petitioners' attempts to terminate the mortgage
               agreement ...........................................................................10

           3.  Petitioners' refusal to disclose financial details.....................12

        B.  Section 8 Program...........................................................14

   III.   Administrative Proceedings ..............................................................16

SUMMARY OF ARGUMENT ..........................................................................24

STANDARD OF REVIEW ................................................................................26

ARGUMENT......................................................................................................26

   I.     The court lacks jurisdiction to review this appeal
         because the petition for review was untimely .................................26

   II.    The Secretary properly determined that petitioners
         were liable for violations of the Section 236 Regulatory
         Agreement .........................................................................................30

A. Petitioners' theory of constructive approval is not
properly before the Court ...............................................................31

B. Petitioners did not terminate the regulatory
agreement by prepaying their mortgage .....................................32

III.    The Secretary correctly determined that petitioners were
liable for violations of the Section 8 Program ..................................35

IV.    The Secretary imposed appropriate penalties for
petitioners' various violations.............................................................38

A. The Secretary properly applied the "ability to pay"
factor......................................................................................................39

B. The Secretary properly applied the "such other
matters as justice may require" factor.........................................43

CONCLUSION .................................................................................................52

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

## Cases:

*In re Assoc. Trust Financial Services,*
    HUDALJ 96-008-CMP (Feb. 4, 1997)................................................................6

*Avia Dynamics, Inc. v. FAA,*
    641 F.3d 515 (D.C. Cir. 2011) ..........................................................28

*Aylett v. Sec'y of Hous. & Urban Dev.,*
    54 F.3d 1560 (10th Cir.) ...............................................................50

*Bowles v. Russell,*
    551 U.S. 205 (2007) ................................................................ 27, 28

*Campbell v. United States,*
    365 U.S. 85 (1961) ......................................................................41

*Chevron U.S.A. Inc. v. Natural Res. Defense Council,*
    467 U.S. 837 (1984) ...............................................................26

*Cienega Gardens v. United States,*
    503 F.3d 1266 (Fed. Cir. 2007) ......................................................3

*In re Entercare,*
    HUDALJ 01-061-CMP (Dec. 31, 2002) ................................... 41, 43

*Flex Frac Logistics, LLC v. NLRB,*
    746 F.3d 205, 208 (5th Cir. 2014) ........................................ 31, 33

*FW/PBS, Inc. v. Dallas,*
    493 U.S. 215 (1990) .......................................................................26

\* This brief does not chiefly rely upon any authorities.

*HUD v. Corey*,
   HUDALJ 11-M-207-FH-27 (July 16, 2012)................................................6, 49

*Krueger v. Cuomo*,
   115 F.3d 487 (7th Cir. 1997) ...........................................................42

*In re Lord Commons Apartments, LLC*,
   HUDALJ 05-060-CMP (July 20, 2007)..........................................................39

*Marshall v. Jerrico, Inc.*,
   446 U.S. 238 (1980) ...........................................................48

*Missouri v. Jenkins*,
   495 U.S. 33 (1990) ...........................................................28

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
   132 S. Ct. 2566 (2012) ...........................................................29

*Nat'l Tank Truck Carriers, Inc. v. Fed. Highway Admin. of U.S. Dep't. of Transp.*,
   170 F.3d 203 (D.C. Cir. 1999) ...........................................................28

*Natural Res. Def. Council v. Nuclear Regulatory Comm'n*, 666 F.2d
   595 (D.C. Cir. 1981)...........................................................29

*Park Vill. Apts. Tenants Ass'n v. Mortimer Howard Trust*,
   No. 06-7389, 2007 WL 519038 (N.D. Cal. Feb. 14, 2007).....................36, 38

*Penasquitos Vill., Inc. v. N.L.R.B.*,
   565 F.2d 1074 (9th Cir. 1977) ...........................................................50

*In re Smith*,
   HUDALJ 91-1609-DB (LDP) (Oct. 28, 1991)...........................................44, 49

iv

*Spezzaferro v. Fed. Aviation Admin.*,
  807 F.2d 169 (Fed. Cir. 1986) .......................................................................44

*Stone v. INS*,
  514 U.S. 386 (1995) .........................................................................................28

*U.S. Dep't. of Agric. v. Kelly*,
  38 F.3d 999 (8th Cir. 1994) ............................................................................29

*United States ex rel. Totten v. Bombardier Corp.*,
  380 F.3d 488 (D.C. Cir. 2004) .......................................................................32

*In re Yetiv*,
  HUDALJ 02-001-CMP (Sept. 2, 2003) .........................................................42

# Statutes:

*Administrative Procedure Act ("APA"):*

    5 U.S.C. § 554 et seq. ...................................................................6

    5 U.S.C. § 557(b) ....................................................................6, 50

    5 U.S.C. § 706(2)(A) ....................................................................26

    5 U.S.C. § 706(2)(E) ....................................................................26

*National Housing Act:*

    12 U.S.C. § 1701, et seq. .................................................................3

    12 U.S.C. § 1715z-1 ...................................................................4, 8

    12 U.S.C. § 1715z-15 ...................................................................34

    12 U.S.C. § 1715z-15(a) ..........................................................31, 32

    12 U.S.C. § 1735f-15 ............................................................1, 5, 16

    12 U.S.C. § 1735f-15(c)(1)(A) ................................................5, 33, 34

    12 U.S.C. § 1735f-15(e) ................................................2, 7, 24, 26, 28, 29

    12 U.S.C. § 1735f-15(e)(2) .....................................................31, 32, 33

    12 U.S.C. § 1735f-15(e)(3) ...........................................................26

*United States Housing Act:*

    42 U.S.C. § 1437a(a) ...................................................................37

42 U.S.C. § 1437f ................................................................ 2, 4, 6, 15

42 U.S.C. § 1437f(a) ..........................................................................4

42 U.S.C. § 1437f(c)(3) .....................................................................37

42 U.S.C. § 1437f(c)(8)(A) ....................................................... 5, 14, 35

42 U.S.C. § 1437f(c)(8)(B) ............................................ 5, 14, 22, 35, 36, 37

42 U.S.C. § 1437f(c)(8)(D) .................................................................37

42 U.S.C. § 1437z-1(b) .......................................................... 2, 5, 6, 16, 17

*Other Statutes:*

29 U.S.C. § 160(e) ............................................................................32

49 U.S.C. § 46110(a) .........................................................................28

Pub. L. No. 98-181, § 433, 97 Stat. 1153 (1983) ............................................34

Pub. L. No. 90-446 (Aug. 4, 1968) .........................................................4

**Regulations**:

24 C.F.R. § 26.28 ..............................................................................6

24 C.F.R. § 26.45(e) .........................................................................39

24 C.F.R. § 26.52(k) .................................................................. 6, 31, 49

24 C.F.R. § 30.10 ....................................................................... 39, 43

24 C.F.R. § 30.70 ............................................................................6

24 C.F.R. § 30.75(b) .......................................................................39

24 C.F.R. § 30.80 ..........................................................................39

24 C.F.R. § 30.80(c) .......................................................................39

24 C.F.R. § 30.80(g) .......................................................................42

24 C.F.R. § 30.85 ............................................................................6

24 C.F.R. § 30.95 ............................................................................6

24 C.F.R. § 26.52(a) ........................................................................6

24 C.F.R. § 207.253 .......................................................................31

24 C.F.R. § 207.253a ......................................................................31

24 C.F.R. § 402.8(b) .................................................................. 36, 37

### Legislative Materials:

128 Cong. Rec. 7853 (1982) ..........................................................34

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————————

No. 13-1198

————————————

JAMES HARRY GRIER, et al.,

Petitioners,

v.

UNITED STATES DEPARTMENT OF
HOUSING & URBAN DEVELOPMENT,

Respondent.

————————————

ON PETITION FOR REVIEW OF AN ORDER OF THE
UNITED STATES DEPARTMENT OF
HOUSING & URBAN DEVELOPMENT

————————————

CORRECTED BRIEF FOR RESPONDENT

————————————

## JURISDICTIONAL STATEMENT

This is an appeal from a final agency decision issued on May 28, 2013,

in which the United States Department of Housing and Urban

Development (HUD) imposed civil money penalties on petitioners, Mantua

Gardens East, Inc., and its owner, Harry Grier.  The authority to impose

such penalties arose from 12 U.S.C. § 1735f-15, which authorizes the

Secretary of HUD to impose civil money penalties against owners, and

officers or directors of corporate mortgagors, of multifamily properties for which HUD insures the mortgage loan; and from 42 U.S.C. § 1437z-1(b), which authorizes the Secretary of HUD to impose civil money penalties against any owner of a property receiving project-based assistance under 42 U.S.C. § 1437f.  Petitioners filed their petition for review on June 18, 2013.  As discussed further below, this filing was beyond the 20-day appeal period prescribed by 12 U.S.C. § 1735f-15(e), and the Court therefore lacks jurisdiction to review this petition.

## STATEMENT OF THE ISSUES

I.      Whether the Court lacks jurisdiction to review this petition where it was filed beyond the 20-day statutory deadline for judicial review.

II.     Whether the Secretary properly determined that petitioners were liable for violations of Section 236 of the National Housing Act.

III.    Whether the Secretary properly determined that petitioners were liable for violations of Section 8 of the United States Housing Act.

IV.     Whether the Secretary imposed appropriate civil money penalties based on petitioners' various violations.

**PERTINENT STATUTES AND REGULATIONS**

The pertinent statutes are reproduced in the addendum to this brief.

**STATEMENT OF THE CASE**

**I.**    **Statutory Background**

This case concerns two particular HUD programs: the Section 236 program, which is part of the National Housing Act, and the Section 8 program, which is part of the United States Housing Act. The following discussion sets forth the statutory and regulatory background for each program, as well as the civil money penalties that can be imposed for violations of the programs.

1. In 1934 Congress enacted the National Housing Act, 12 U.S.C. § 1701, et seq., to address the declining national supply of affordable housing. The Act authorizes the Secretary of HUD to insure and subsidize mortgages under various programs designed to encourage property developers to create and maintain affordable housing properties. *See generally Cienega Gardens v. United States*, 503 F.3d 1266, 1270-71 (Fed. Cir. 2007). In exchange for HUD's assistance in insuring and repaying mortgages, the property developers are required to operate their programs

3

in compliance with certain statutory, regulatory, and contractual
obligations.

In 1968 HUD implemented Section 236 of the National Housing Act,
12 U.S.C. § 1715z-1, in order to increase the availability of housing for low-
income families.  Pub. L. No. 90-446 (Aug. 4, 1968).  Under the program, the
Federal Housing Administration (FHA) insures loans to private developers
in exchange for their commitment to provide low-income housing through
the life of the agreement.  *Id.*  As part of the program, HUD also provides
monthly interest-reduction payments to FHA-approved mortgagees
(lenders) on behalf of the mortgagors (owners/developers), which serves
to reduce the mortgagors' effective interest rate to 1%.  12 U.S.C. § 1715z-1.
In exchange for these benefits, the mortgagor executes a Regulatory
Agreement that requires it to operate the multifamily project in accordance
with various programmatic and contractual obligations.  *Id.*

2.  The Section 8 program was passed as part of the United States
Housing Act of 1937 to provide rental assistance to eligible low-income
tenants.  *See* 42 U.S.C. § 1437f.  The express purpose of the program is
"aiding low-income families in obtaining a decent place to live and . . .
promoting economically mixed housing."  42 U.S.C. § 1437f(a).  Under

4

Section 8, HUD subsidizes low-income tenants' rents by making rental subsidy payments to participating multifamily project owners on behalf of those tenants. *Id.* In exchange for this financial assistance, project owners execute a Housing Assistance Payment ("Housing Assistance") contract that requires, inter alia, owners to provide HUD and affected tenants at least one year's notice before terminating the contract. 42 U.S.C. § 1437f(c)(8)(A). Absent this required notice, the owner may not evict tenants or increase the tenants' rent payments until such time as the owner has provided notice and one year has elapsed. 42 U.S.C. § 1437f(c)(8)(B).

3. A violation of the section 236 and section 8 programs may lead to liability for civil money penalties under 12 U.S.C. § 1735f-15 and 42 U.S.C. § 1437z-1(b), respectively. Civil money penalties were authorized as an administrative remedy to curtail abuse of HUD programs, and they may be imposed for certain violations of HUD's multifamily housing regulatory requirements. Civil money penalties for violations of the Section 236 program apply to, inter alia, mortgagors and officers or directors of a corporate mortgagor. 12 U.S.C. § 1735f-15(c)(1)(A). Civil money penalties for violations of the Section 8 program apply to any owner of a property

receiving project-based assistance under 42 U.S.C. § 1437f (Housing

Assistance program).  42 U.S.C. § 1437z-1(b).

An action to collect civil money penalties proceeds pursuant to the

Administrative Procedure Act, 5 U.S.C. § 554 et seq.  24 C.F.R. §§ 26.28,

30.95.  The action commences with the issuance of a pre-penalty notice

advising the liable party of the contemplated action, and it is followed by

filing a complaint with the ALJ seeking civil money penalties.  24 C.F.R.

§§ 30.70, 30.85.  An ALJ thereafter "issues an initial decision, which

includes findings of fact, conclusions of law, and the amount of any

penalties imposed."  *In re Assoc. Trust Fin. Servs.*, HUDALJ 96-008-CMP at 3

(Feb. 4, 1997).

Either party may appeal the ALJ's initial decision to the Secretary of

HUD or his designee.  24 C.F.R. § 26.52(a).  On appeal, the Secretary has

"all the powers [he] would have in making the initial decision," 5 U.S.C.

§ 557(b), and is "free to adopt or reject the ALJ's findings and conclusions

of law," *HUD v. Corey*, HUDALJ 11-M-207-FH-27 at 2 n.2 (July 16, 2012).

The Secretary may ultimately "affirm, modify, reduce, reverse,

compromise, remand, or settle any relief granted in the initial decision."  24

C.F.R. § 26.52(k).  Once the Secretary imposes civil money penalties against

6

a party, the party may seek judicial review of the penalty by filing a

petition for review with the appropriate court of appeals within 20 days of

the entry of the Secretary's order.  12 U.S.C. § 1735f-15(e).

## II.    Factual Background

This case involves the Mantua Gardens East Project ("Mantua

Project"), a 52-unit affordable housing complex located in Philadelphia,

Pennsylvania, and which is owned by petitioner Mantua Gardens East, Inc.

("Mantua Gardens"), a non-profit corporation, and whose president and

board chairman is petitioner James Grier.  Mantua Gardens has four other

board members, all of whom are tenants of the Mantua Project.  RR2, Doc.

073, pp. 734-35.[1]  They are all appointed by Grier, and none of them

perform any official functions on behalf of Mantua Gardens.  RR2, Doc.

073, pp. 736-37.

---

[1] For the sake of convenience, this brief uses the same format as petitioners' brief for citing the administrative record: RR1, Doc. 01, p. 1, where the number following "RR" represents the volume containing the document (the record contains three volumes), and the number following "Doc." is the document number within that volume.  If a document contains multiple numbered exhibits, the citation will reference the exhibit number as well: RR1, Doc. 01, Ex. 1, p. 1.

Starting as early as 1970, petitioners have been subject to various statutory and regulatory requirements pursuant to their participation in HUD's housing programs under Section 236 and Section 8.  Petitioners do not contest the following factual allegations describing their participation in these programs.

## A.  Section 236 Program

### 1. *The original mortgage and other loans*

On December 30, 1970, Mantua Gardens (then known as "Friends Housing, Inc.") obtained a $720,200 mortgage from Firstrust Savings and Bank (then known as "First Federal Savings and Loan Association"), an FHA-approved lender.  RR2, Doc. 105, Exs. 1, 2.  The mortgage's maturity date was May 1, 2012, and it was secured as part of the Section 236 program, under which FHA insured the mortgage, and HUD provided interest-reduction payments that reduced Mantua Gardens' annual interest rate from 8.5% to 1%.  RR2, Doc. 105, Exs. 1, 2, 3; *see* 12 U.S.C. § 1715z-1.  In exchange for this financial assistance, Mantua Gardens entered into a Regulatory Agreement with HUD to ensure Mantua Gardens would provide and maintain affordable housing.  RR2, Doc. 105, Ex 3.  In particular, the Regulatory Agreement required Mantua Gardens to: 1)

8

provide housing only to low-income families, as defined by HUD; 2) maintain a "reserve for replacement" fund, controlled by Firstrust, which would be used to pay for repairs and maintenance at the Mantua Project, and could only be withdrawn with HUD's written consent; 3) abstain from conveying, transferring, or encumbering any of the Mantua Project's real property without prior written approval from HUD; 4) abstain from assigning, transferring, disposing of, or encumbering the Mantua Project's personal property without prior HUD approval; and 5) hire a project manager that was satisfactory to HUD.  *Id.*

Mantua Gardens later entered additional agreements that separately required it to comply with the Section 236 program's regulations.  On July 29, 1983, Mantua Gardens secured a flexible subsidy loan from HUD for $210,174.  RR2, Doc. 105, Ex. 4.  In exchange for the loan, Mantua Gardens entered a financial assistance contract and a use agreement with HUD, both of which independently obligated Mantua Gardens to operate the Mantua Project in accordance with the Section 236 program's regulations until July 1, 2011, even if the Regulatory Agreement was terminated prior to that date.  *Id*.

2. *Petitioners' attempts to terminate the mortgage agreement*

On November 1, 2005, Grier sent a letter to Firstrust seeking the bank's assistance in voluntarily terminating Mantua Gardens' Regulatory Agreement. RR2, Doc. 105, Ex. 50. The letter stated that Mantua Gardens' "interest [was] to expand the mission of the corporation to include other activities than solely providing housing," and indicated that petitioners wished to "free the Project of the [Regulatory Agreement]." *Id.* Firstrust thereafter filed an insurance termination request with HUD on behalf of Mantua Gardens. RR2, Doc. 105, Ex. 51. HUD denied the request on July 3, 2006, citing Mantua Gardens' failure to submit several required reports or to sign a use agreement relating to the request.[2] RR2, Doc. 105, Ex. 6.

On January 29, 2008, Grier sent Firstrust a letter requesting that the bank deposit $325,000 from Mantua Gardens' reserve account into an account at Wachovia. RR2, Doc. 105, Ex. 54. Grier assured Firstrust that the funds at Wachovia would be "subject to the same expenditures

---

[2] This use agreement was separate from the use agreement Mantua Gardens entered to secure its flexible subsidy loan in 1983. According to testimony from a HUD officer, had Mantua Gardens' termination request been approved, petitioners would have been required to sign this separate use agreement, extending their Section 236 obligations through the loan's maturity date of May 2012. RR2, Doc. 071, pp. 92-93.

restrictions as now with Firstrust Bank." *Id.* Firstrust transferred the funds on February 7, 2008. RR2, Doc. 105, Ex. 55. Petitioners never requested HUD's approval for this transfer. RR2, Doc. 105, Ex. 65, p. 167. Mantua Gardens used the transferred funds as collateral to secure a $325,000 loan from Wachovia on February 13, 2008. RR2, Doc. 105, Ex. 58. Mantua Gardens never sought or received HUD's approval to use the transferred funds as collateral for the loan.

Less than one month later, on February 21, 2008, Grier formed Mantua Gardens East, LLC ("Mantua LLC"), in which he was the sole shareholder. RR2, Doc. 105, Ex. 60. Without HUD approval, Mantua Gardens used the $325,000 loan from Wachovia to lend $170,000 to the newly formed Mantua LLC. *See* RR2, Doc. 105, Ex. 63-a. Four days later, on February 25, 2008, Grier, acting as managing member for Mantua LLC, sent Firstrust a cashier's check for $170,218.28 "in full payment" of the original mortgage. RR2, Doc. 105, Exs. 57, 61. Grier never sought or received HUD's approval for the sale of the mortgage to Mantua LLC, and Mantua LLC never sought or received approval to be an FHA-approved mortgagee. *See* RR2, Doc. 105, Ex. 43. Additionally, Grier has refused to disclose details regarding the approximately $155,000 remaining from the

11

Wachovia loan, citing his Fifth Amendment right against self-incrimination.  RR2, Doc. 073, pp. 755–63.

### 3.  *Petitioners' refusal to disclose financial details*

Mantua Gardens was thereafter required to make payments of $5,200 per month to Mantua LLC, the new mortgagee.  RR2, Doc. 105, Exs. 65, pp. 201-202; 63b.  Mantua LLC, in turn, was required to pay approximately $1,800 per month to Mantua Gardens as repayment for the $170,000 loan. *Id.*  These payments, which resulted in a net monthly gain of approximately $3,400 for Mantua LLC, continued from February 2008 until May 2012, totaling $224,400 to Mantua LLC.  RR2, Doc. 105, Ex. 63-b.  Grier has refused to disclose details regarding this money, citing his Fifth Amendment right against self-incrimination.  RR2, Doc. 073, p. 802.

On April 7, 2008, Grier executed, on behalf of Mantua Gardens, an open-end mortgage in exchange for a $50,000 loan from Wachovia.  RR2, Doc. 105, Exs. 46, 63-a.  As collateral for the loan, Grier pledged one of the buildings in the Mantua Project, as well as its associated "estates, rights, tenements . . ."  *Id.*  Grier never sought or received HUD's approval to encumber the building or its property, and he has refused to disclose

12

details regarding this second Wachovia loan of $50,000, citing his Fifth Amendment right against self-incrimination, RR2, Doc. 073, pp. 797–98.[3]

Following petitioners' various actions taken in 2008 without HUD's knowledge or approval, Mantua Gardens continued to receive more than $500,000 in federal financial assistance for fiscal years 2008, 2009, and 2010. *See* RR2, Doc. 071, pp. 341-47; ALJ Op. 8.[4]  Mantua Gardens' financial reports for each of these years failed to include any information concerning the flexible subsidy loan (secured in 1983) or any of the loans related to Wachovia or Mantua LLC.  RR2, Doc. 105, Exs. 17, 18, 19.  The 2009 and 2010 reports were not audited, as Mantua Gardens instead elected to submit owner-certified statements.  RR2, Doc. 105, Ex. 16.

---

[3] Grier has, however, acknowledged that he personally received a $50,000 "loan" from Mantua Gardens, using proceeds from the first Wachovia loan, as payment for an unrelated building project.  RR2, Doc. 105, Ex. 65, pp. 179-83.  Grier approved the loan on behalf of Mantua Gardens.  RR2, Doc. 105, Ex. 65, p. 184.  Grier has likewise admitted that he received at least $50,000 from Mantua LLC as an "advance" towards an "expected honorarium."  RR2, Doc. 105, Ex. 65, pp. 233-34.

[4] Due to an apparent clerical error, the exhibits reflecting the precise breakdown of HUD's financial assistance during these years was not entered into the record, though the record contains the ALJ's order admitting these exhibits into evidence as trial exhibits 68 and 69.  *See* RR2, Doc. 080.  Nonetheless, there is no dispute as to the accuracy of these figures, and these documents can be supplemented to the record if necessary.  *See* F.R.A.P. 16(b).

On July 1, 2011, petitioners fired Mantua Gardens' management agent, Community Realty Management, without HUD's approval. *See* RR2, Doc. 105, Exs. 38, 39. Grier thereafter declared that he was qualified to self-manage the property, and he has managed the project since then without HUD's approval. *Id.*

## B. Section 8 Program

On July 20, 1983, Mantua Gardens entered a Housing Assistance contract with HUD pursuant to the Section 8 program. RR2, Doc. 105, Ex. 12. The contract was for a term of five years, and was renewed consistently until July 2011. *Id*; RR2, Doc. 105, Ex. 13. Under the contract, HUD was to provide project-based rental subsidies for Mantua Gardens' Section 8 tenants. RR2, Doc. 105, Ex. 12. In exchange for this financial assistance, Mantua Gardens was required to provide HUD and affected tenants at least one year's notice before terminating the contract or raising rent. *Id.*; *see* 42 U.S.C. §§ 1437f(c)(8)(A), (B).

14

On June 10, 2010, petitioners signed a one-year "Watch List" renewal Housing Assistance contract to be effective July 1, 2010.[5]  RR2, Doc. 105, Ex. 13.  Petitioners did not provide any notice to HUD or the property's subsidized tenants before this contract expired on June 30, 2011.  *See* RR2, Doc. 073, pp. 813-14; RR2, Doc. 105, Ex. 20, Bates no. 32.

On September 6, 2011, petitioners issued a notice stating that all subsidized tenants would have to sign new leases and pay rents that were "$100.00 less than HUD's Contract Rent."  RR2, Doc. 105, Ex. 20, Bates no. 50.  In late September 2011, petitioners started issuing Vacate Notices to formerly subsidized tenants, requiring that they pay the increased market rate retroactively starting in July 2011.  RR2, Doc. 105, Ex. 20, Bates no. 70.  On October 7, 2011, petitioners issued another notice entitled "Rent

---

[5] HUD enters a one-year "Watch List" contract instead of the normal 5-year contract in certain circumstances where a property owner has its rents reduced but refuses to restructure its debt to accommodate the decrease in revenue.  RR2, Doc. 072, pp. 641-45.  Here, Mantua Gardens' had been charging above-market rents, and the statute requires that those rents be reduced and that the owner restructure its debt to assure it can continue operating with the lower rents.  *See* RR2, Doc. 072, pp. 523-524, 641-44; *see* 42 U.S.C. 1437f note at Section 512(2)(A) and Section 514.  Petitioners refused to restructure their debt.  *See* RR2, Doc. 072, pp. 533-34.  When an owner in this position refuses to restructure, HUD requires that the Housing Assistance contract be renewed for one year under a "Watch List" renewal contract, which requires attention.  RR2, Doc. 072, pp. 641-46.

Increase," in which they stated that "all subsidized tenants must pay HUD

approved Market Rent."  RR2, Doc. 105, Ex. 20, Bates no. 55.

## III.    Administrative Proceedings

1.  On May 15, 2012, in response to petitioners' various attempts to

evade HUD's requirements, HUD filed a complaint with its Office of

Hearing and Appeals seeking civil money penalties against petitioners

pursuant to 12 U.S.C. § 1735f-15 and 42 U.S.C. § 1437z-1(b).[6]  RR2, Doc. 001.

Counts 1-7 of the complaint sought penalties totaling $212,500 against

petitioners jointly and severally pursuant to 12 U.S.C. § 1735f-15, alleging

the following violations of the Regulatory Agreement under the Section 236

program:

> Count 1: Encumbering the Project's Personal Property
> Count 2: Encumbering the Project's Real Property
> Count 3: Transferring and Encumbering the Reserve Account
> Count 4: Terminating the Management Agent Without HUD
>   Approval
> Count 5: Failing to Comply with Financial Reporting
>   Requirements for Fiscal Year 2008
> Counts 6-7: Failing to Comply with Financial Reporting
>   Requirements for Fiscal Year 2009 and Fiscal Year 2010

---

[6] For a precise breakdown of the penalties proposed by HUD for each
count, as well as the maximum penalty allowed, see page ten of the ALJ's
decision.

RR2, Doc. 001, pp. 19-21.

Counts 8-99 sought penalties totaling $1,260,000[7] solely against

Mantua Gardens pursuant to 42 U.S.C. § 1437z-1(b), alleging the following

statutory and contractual violations under the Section 8 Program:

> Count 8: Failing to Notify the Contract Administrator One Year Prior
> to Terminating the Housing Assistance Contract
> Count 9: Failing to Notify HUD One Year Prior to Terminating the
> Housing Assistance Contract
> Counts 10-54[8]: Failing to Notify the Project's Subsidized Tenants One
> Year Prior to Terminating the Housing Assistance Contract
> Counts 55-99[9]: Raising Rental Amounts on the Project's Subsidized
> Tenants Without Providing Prior Notice

RR2, Doc. 001, pp. 26-31.

2.  On February 1, 2013, an administrative law judge found

petitioners liable on all counts for violating statutory, regulatory, and

contractual obligations, and imposed a penalty on petitioners jointly and

severally in the amount of $196,875, and on petitioner Mantua Gardens in

the amount of $337,500.  ALJ Opinion ("ALJ Op.").

---

[7] The initial complaint sought $1,380,000, but was later amended to
dismiss several counts and reduce the proposed penalty to $1,260,000.

[8] HUD later amended the complaint to dismiss Counts 17, 25, 44, and
47.

[9] HUD later amended the complaint to dismiss Counts 62, 70, 89, and
92.

First, the ALJ noted that petitioners did not dispute most of the factual allegations against them.  ALJ Op. 10-11.  Instead, Grier had "consistently acknowledged that he, in fact, [had] committed or caused to be committed most of the acts alleged by HUD," and he openly declared that his primary motivation was to free Mantua Gardens from the Regulatory Agreement.  *Id.*  As the ALJ described it, "[f]or whatever reason, after more than 30 years as a participant in the Section 236 and Section 8 programs, [petitioners] simply were no longer willing to comply with HUD's requirements."  ALJ Op. 11.

The ALJ next turned to the alleged violations of the Section 236 program.  ALJ Op. 11-14.  The ALJ rejected petitioners' contention that they were no longer subject to the Regulatory Agreement at the time of many of their alleged violations.  *Id.*  First, the ALJ rejected petitioners' argument that HUD's denial of their request for termination in July 2006 was pretextual and thus served as "constructive approval" of termination.  ALJ Op. 11-12.  The ALJ noted that petitioners had cited no authority to support this theory, and found that "no legal theory . . . allow[ed] a party to disregard an agency decision with which it disagree[d]."  *Id.*

18

Second, the ALJ rejected petitioners' argument that the Regulatory Agreement was nullified by the later prepayment of the mortgage in 2008. ALJ Op. 12-14.  The ALJ noted that under HUD regulations, there were only three mechanisms for terminating an insurance contract, none of which included the sale/payment of the mortgage effected by petitioners. ALJ Op. 13.  The ALJ also observed that, regardless of the Regulatory Agreement, petitioners had separately entered into a use agreement (in connection with its flexible subsidy loan in 1983) that *independently* required them to comply with the Section 236 program's regulations until July 1, 2011.  ALJ Op. 13-14.

The ALJ next turned to the penalty determination.  In applying the various regulatory factors, the ALJ found that "[t]he sheer brazenness of [petitioner]'s scheme also strongly supports a sizeable penalty as a means to deter other would-be violators.  [Petitioner] Grier believed he had found a loophole in HUD's regulations that would allow him to use the Mantua Gardens East Project for his own purposes."  ALJ Op. 27.  The ALJ accordingly found that petitioners deserved the maximum penalties on every count, resulting in total liability of $262,500 for petitioners jointly and severally, and $2,325,000 for petitioner Mantua Gardens.  ALJ Op. 16-29.

19

The ALJ also found, however, that two of the regulatory factors warranted reductions in the penalty: "ability to pay" and "such other matters as justice may require." ALJ Op. 25-27. With respect to "ability to pay," the ALJ noted that it was petitioners' burden to show that it could not pay the requested amount, and found that they had "introduced no evidence whatsoever to substantiate their claims of financial vulnerability." ALJ Op. 25. The ALJ therefore did not reduce the maximum penalty of $262,500 imposed on petitioners jointly and severally. ALJ Op. 9-10. However, the ALJ determined that petitioner Mantua Gardens could not pay more than the $1.5 million value of its property, and suggested that Mantua Gardens could "reasonably pay" a penalty of "up to 30% of the company's value, or $450,000." ALJ Op. 26.

The ALJ also found that HUD had conducted its penalty analysis in bad faith, warranting a penalty reduction under the factor of "such other matters as justice may require." ALJ Op. 14-16, 27. Specifically, the ALJ found that HUD's testimony reflected that its "underlying motivation was to deal [petitioners] a financially fatal injury rather than to punish their violations of their regulatory, statutory, and contractual obligations." ALJ Op. 27. The ALJ accordingly applied a 25% penalty reduction, lowering

20

the ultimate joint and several penalty on petitioners from $262,500 to
$196,875, and lowering the penalty on Mantua Gardens from $450,000 to
$337,500. ALJ Op. 27-29.

3. The government filed an appeal of the ALJ's penalty
determinations, and petitioners filed a cross-appeal of the ALJ's liability
determinations. On May 28, 2013, the Secretarial Designee issued a
decision upholding the liability determinations on all counts but modifying
the penalty amounts. Secretary's Opinon ("Sec. Op."). The Secretary
vacated the ALJ's reduction of petitioners' joint and several penalty,
restoring it to $262,500 as originally imposed by the ALJ. Sec. Op. 11-13.
The Secretary also vacated the ALJ's reductions of petitioner Mantua
Gardens' penalty, and restored it to the amount proposed by the
government, $1,260,000, which was $1,065,000 less than the penalty
originally imposed by the ALJ, 2,325,000. Sec. Op. 8-13.

The Secretary concluded that petitioners were subject to the Section
236 Regulatory Agreement at all relevant times. Sec. Op. 3-6. The
Secretary agreed with the ALJ that petitioners had failed to prove 1)
"constructive termination" of the Regulatory Agreement based on HUD's
denial of petitioners' termination request, or 2) termination of the

21

Regulatory Agreement based on the sale of the mortgage to Mantua LLC. *Id.* Regarding the sale of the mortgage, the Secretary noted that a valid "prepayment" of the mortgage pursuant to regulation required a determination from the Secretary that the project was no longer meeting the housing needs of lower income families, and petitioners could not have satisfied this requirement where they had not even requested Secretarial approval of the prepayment. Sec. Op. 5-6.

The Secretary also concluded that petitioners were liable for all counts relating to violations of the Housing Assistance contract under the Section 8 program. Sec. Op. 6-7. This included failure to provide proper notice of the termination of Housing Assistance contracts and of rental increases. *Id.* The Secretary noted that the prohibition of raising rents without proper notice was not only a contractual obligation found in the Housing Assistance contract but a statutory requirement pursuant to 42 U.S.C. § 1437f(c)(8)(B). *Id.* The Secretary also concluded, contrary to petitioners' claims, that they had in fact increased rental amounts, which were measured by the actual portion tenants were responsible for paying, as opposed to the HUD market value. Sec. Op. 7.

22

The Secretary next turned to the ALJ's penalty determination and concluded that the ALJ had incorrectly applied the "ability to pay" and "such other factors as justice may require" criteria to reduce petitioners' penalties. Sec. Op. 8-13. Regarding ability to pay, the Secretary determined that petitioners could not overcome the presumption that they could pay the penalty where they presented "no evidence . . . showing [Mantua Gardens]' ability to pay any penalty amount." Sec. Op. 9. The Secretary thus reversed the ALJ's determination that Mantua Gardens could only pay $450,000, and imposed the $1,260,000 penalty proposed by HUD. Sec. Op. 11.

The Secretary next vacated the ALJ's 25% penalty reduction premised on bad faith in HUD's penalty analysis. Sec. Op. 11-13. The Secretary noted as a general matter that federal officials acting within their official responsibility are presumed to have acted in good faith. Sec. Op. 11. The Secretary then specifically determined that the ALJ had misinterpreted the testimony of HUD official Ms. Shank as suggesting that HUD had set out to bankrupt petitioners rather than, as the context made clear, to *reduce* the penalty to an amount petitioners could realistically pay. Sec. Op. 11-12. The Secretary identified other testimony establishing that HUD had

properly applied the various regulatory factors to penalize petitioners'
egregious violations.  Sec. Op. 12.  Ultimately, the Secretary vacated the
ALJ's 25% reduction in penalty, and modified the total penalty to $262,500
against petitioners jointly and severally, and $1,260,000 against petitioner
Mantua Gardens.  Sec. Op. 12-13.

## SUMMARY OF ARGUMENT

1.  As an initial matter, this petition for review is untimely.
Petitioners filed the petition more than 20 days after entry of the Secretary's
decision in violation of 12 U.S.C. § 1735f-15(e).  Petitioners note that they
filed their petition within 20 days of the date they were served with the
Secretary's decision, but the statute explicitly identifies the "entry" of the
underlying decision as the relevant event for the appeal period.
Accordingly, the petition for review should be dismissed for lack of
jurisdiction.

2.  In any event, the Secretary of HUD properly determined that
petitioners were liable for civil money penalties based on violations of the
Section 236 and Section 8 programs.  Petitioners were subject to the
Regulatory Agreement under Section 236 at all relevant times, and they

have not identified any authority to support their contention that, in the process of violating this agreement, they somehow freed themselves of it.

3.  With respect to the Section 8 program, the Secretary correctly concluded that petitioners were at all relevant times subject to a statutory and regulatory requirement to provide one year's notice before terminating the Housing Assistance contract with HUD or before raising the rent of any of their subsidized tenants.  It is also clear that petitioners did in fact raise their subsidized tenants' rents in violation of these requirements.

4.  The Secretary also assessed fair and appropriate penalties against petitioners jointly and severally for $262,500, and against petitioner Mantua Gardens for $1,260,000.  In imposing these penalties, the Secretary properly reversed the ALJ's determination that petitioners' damages should be mitigated based on an inability to pay where petitioners had not presented any evidence to overcome the presumption that they could in fact pay HUD's proposed penalties.

The Secretary likewise correctly reversed the ALJ's finding that HUD had conducted its penalty analysis in bad faith, and vacated the ALJ's corresponding 25% penalty reduction.  The ALJ's bad faith finding was based on a misinterpretation of HUD's testimony, and the record reflects

that HUD's penalty proposal was based on a fair and thorough consideration of the various regulatory factors, in which HUD appropriately penalized the egregiousness of petitioners' misconduct.

## STANDARD OF REVIEW

The Secretary's decision may be disturbed only if it is not supported by substantial evidence, 5 U.S.C. § 706(2)(E), or if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see* 12 U.S.C. § 1735f-15(e)(3) (adopting that standard). The Secretary's reasonable interpretation of the statute it is charged with administering is entitled to deference under *Chevron U.S.A. Inc. v. Natural Res. Defense Council*, 467 U.S. 837 (1984). The Court has an independent obligation to determine its own jurisdiction. *See*, *e.g.*, *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231 (1990) ("federal courts are under an independent obligation to examine their own jurisdiction").

## ARGUMENT

**I.    The court lacks jurisdiction to review this appeal because the petition for review is untimely.**

Under 12 U.S.C. § 1735f-15(e), a party seeking judicial review of an order imposing civil money penalties must file a petition in the appropriate

26

court of appeals "within 20 days after the entry of such order or determination."  Here, the Secretary entered his order imposing civil money penalties on May 28, 2013, and the 20-day period for filing a petition for review expired on June 17, 2013.  Petitioners, however, did not file their petition until the next day, June 18, 2013, and the Court therefore lacks jurisdiction to review it.

1.  The Supreme Court has "long held that the taking of an appeal within the prescribed time limit is mandatory and jurisdictional."  *Bowles v. Russell*, 551 U.S. 205, 209 (2007) (internal quotation and citation omitted).  In *Bowles*, the Supreme Court ruled that a party's failure to file an appeal within the time period prescribed by statute, even though in compliance with a district court's order, barred appellate review because the statutory time limit was jurisdictional.  *Id.* at 213.  Though acknowledging that other cases distinguished between claims-processing rules and jurisdictional rules, the Supreme Court concluded that "none of th[ose cases] calls into question our longstanding treatment of statutory time limits for taking an appeal as jurisdictional."

While this Court recently ruled that a statutory time limit was not jurisdictional, it was addressing a materially different statute from the one

27

at issue here.  In *Avia Dynamics, Inc. v. FAA*, 641 F.3d 515, 519 (D.C. Cir. 2011), the Court held that a 60-day time limit for filing a petition for review under 49 U.S.C. § 46110(a) did "not constitute a jurisdictional bar." However, that statute, after indicating that "[t]he petition must be filed not later than 60 days after the order is issued," adds that "[t]he court may allow the petition to be filed after the 60th day only if there are reasonable grounds for not filing by the 60th day."  Thus, the text of 49 U.S.C. § 46110(a) is markedly different from that of 12 U.S.C. § 1735f-15(e), which provides no exceptions for an untimely petition for review.

Here, the judicial review provision for civil money penalties, 12 U.S.C. § 1735f-15(e), serves the same purpose as the notice of appeal provision addressed in *Bowles*, and must similarly be understood as prescribing a jurisdictional time limit.  *See Stone v. INS*, 514 U.S. 386, 405 (1995) ("[S]tatutory provisions specifying the timing of review . . . are, as we have often stated, 'mandatory and jurisdictional,' . . . and are not subject to equitable tolling.") (addressing petitions for review under the Immigration and Nationality Act) (quoting *Missouri v. Jenkins*, 495 U.S. 33, 45 (1990)); *Nat'l Tank Truck Carriers, Inc. v. Fed. Highway Admin. of U.S. Dep't. of Transp.*, 170 F.3d 203, 209 (D.C. Cir. 1999) ("'The 60 day period for

seeking judicial review set forth in the Hobbs Act is jurisdictional in nature, and may not be enlarged or altered by the courts.'") (quoting *Natural Res. Def. Council v. Nuclear Regulatory Comm'n*, 666 F.2d 595, 602 (D.C. Cir. 1981)).

2.  Petitioners note that they were not served with the Secretary's decision until May 29, 2013,[10] Petitioners' Brief ("Pet. Br.") 1 n.2, but they make no effort to explain how the date of service is relevant to the appeal deadline.  "[T]he best evidence of Congress's intent is the statutory text." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2583 (2012).  Here, the statute clearly provides that the appeal period commences with the "*entry of [the] order.*"  12 U.S.C. § 1735f-15(e) (emphasis added).  The statute does not otherwise define entry, nor make any reference to the date of service. Under these circumstances, petitioners can identify no basis for defining the appeal period as starting with any date other than May 28, 2013, when the Secretary *entered* his decision.  *See U.S. Dep't. of Agric. v. Kelly*, 38 F.3d 999, 1001-02 (8th Cir. 1994) (rejecting argument that appeal period commenced with date of "service" rather than date of "order" where

---

[10] Petitioners erroneously list the year of the service date as 2012 in their opening brief.  Pet. Br. 1.

statute expressly referred to the "order," and "[s]ervice is a distinct

function occurring after the order is issued and docketed"). Accordingly,

this petition for review is untimely, and the Court lacks jurisdiction to

review it.

## II. The Secretary properly determined that petitioners were liable for violations of the Section 236 Regulatory Agreement.

The Secretary properly determined that petitioners violated the

Regulatory Agreement they entered as part of the Section 236 program.

Petitioners have not disputed the factual allegations underlying their

regulatory violations. They instead argue that they did not violate the

Regulatory Agreement because they were not subject to it at the time of

many of their alleged violations. In particular, they allege that two

separate events served to terminate their Regulatory Agreement: 1)

Firstrust's transfer of money from the reserve fund; and 2) petitioners'

transfer and prepayment of the mortgage.

Neither of these events terminated the Regulatory Agreement. The

agreement was terminable only under specific circumstances expressly

identified by statute and regulation, which include prepayment with the

approval of the Secretary, a voluntary agreement between the mortgagor

and HUD, or a transfer of the mortgage to HUD.  24 C.F.R. §§ 207.253, 207.253a; 12 U.S.C. § 1715z-15(a).  Petitioners failed to follow any of these mandated procedures.

### A.   Petitioners' theory of constructive approval is not properly before the Court.

Petitioners have either failed to exhaust or waived their arguments that HUD "constructively approved" their termination request.  Petitioners did not exhaust the only argument they present on appeal concerning constructive approval: that HUD constructively approved the termination of the Regulatory Agreement through the acts of its "agent," Firstrust.  Pet. Br. 30-31.  Because this argument was never properly presented before the Secretary,[11] it is barred from the Court's review.  *See* 12 U.S.C. § 1735f-15(e)(2) ("[t]he court shall not consider any objection that was not raised in the hearing conducted pursuant to subsection (d)(1) . . . unless a demonstration is made of extraordinary circumstances causing the failure"); *Flex Frac Logistics, LLC v. NLRB*, 746 F.3d 205, 208 (5th Cir. 2014)

---

[11] On the day that the Secretary issued his decision, May 28, 2013, petitioners filed an "amended" brief that included the Firstrust-as-agent argument.  This filing was well after the time for filing briefs had expired, and Petitioners never sought nor received the Secretary's approval to file the additional brief.  *See* 24 C.F.R. § 26.52(k).

(interpreting similar judicial review language of 29 U.S.C. § 160(e) as

precluding appellate review of arguments not raised before NLRB).

Petitioners make no attempt to identify any "extraordinary circumstances"

under the statutory exception allowing review.  *See* 12 U.S.C. § 1735f-

15(e)(2).

Petitioners have waived their other constructive approval argument

that was rejected by both the ALJ and Secretary below: that HUD denied

petitioners' 2006 request to terminate their mortgage in bad faith, and this

tainted denial amounted to "constructive approval" of the termination

request.  *See United States ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488, 497

(D.C. Cir. 2004) ("Ordinarily, arguments that parties do not make on

appeal are deemed to have been waived.").

### B.    Petitioners did not terminate the regulatory agreement by prepaying their mortgage.

Petitioners claim that they terminated their Regulatory Agreement by

prepaying their mortgage in 2008.  Pet. Br. 27-28.  However, there are clear

statutory requirements for prepayment of an insurance contract, and

petitioners made no attempt to satisfy those requirements.  Under 12 U.S.C.

§ 1715z-15(a), prepayment of a mortgage can terminate an insurance

contract only if the Secretary first makes a series of determinations, including that the housing project is no longer meeting a need for rental housing for lower income families in the area.  Petitioners never requested, let alone secured, the Secretary's approval of their prepayment, and they could not have terminated the insurance contract through prepayment under any other circumstances.

Petitioners do not dispute that they failed to comply with the prepayment conditions.  They instead argue that, even if illegal, their transfer of the mortgage to Mantua LLC meant that they were no longer a mortgagor of a property that had a "mortgage insured, co-insured, or held" by HUD as required to impose liability under the civil money penalty statute.  Pet. Br. 28 (citing 12 U.S.C. § 1735f-15(c)(1)(A)).  But this, again, is an argument that petitioners failed to present before the Secretary, and thus is not properly before the Court.  *See* 12 U.S.C. § 1735f-15(e)(2); *Flex Frac Logistics, LLC*, 746 F.3d at 208.

In any event, petitioners' argument lacks merit.  Their failure to follow the mandated termination procedures (by prepayment or otherwise) meant that they were still subject to the mortgage insurance contract and Regulatory Agreement.  The Regulatory Agreement remained in effect

33

until the mortgage's maturity date of May 1, 2012, regardless of whether

petitioners had paid their mortgage.  As a result, they were still a

mortgagor of a property that had a "mortgage insured" by HUD, and thus

remained liable for civil money penalties under 12 U.S.C. § 1735f-

15(c)(1)(A).[12]

It would be a strange outcome if petitioners' theory were true.

Congress enacted the prepayment provision out of concern that owners

with HUD-insured mortgages were exiting subsidized affordable housing

programs by prepaying the mortgage, thus contributing to a shortage of

affordable housing.  *See* 128 Cong. Rec. 7853 (1982) (statement of Sen.

Dodd).  In passing the prepayment provision, Congress meant to expressly

limit the circumstances in which property owners could exit affordable

housing programs, and assure that if they did it would only be after the

Secretary determined that their participation was no longer necessary.  *See*

Pub. L. No. 98-181, § 433, 97 Stat. 1153, 1221 (1983) (codified as amended at

12 U.S.C. § 1715z-15).  The civil money penalty statute, in turn, was passed

---

[12] Moreover, even aside from the Regulatory Agreement, petitioners had an independent obligation to comply with the Section 236 program regulations until July 1, 2011, as part of the use agreement they entered pursuant to their flexible subsidy loan.

as part of an effort to curtail abuse of HUD programs.  If, as petitioners suggest, they could violate the prepayment provision, and in the process exempt themselves from civil money penalties, it would clearly frustrate the purpose of both statutes.  Petitioners have not identified a single authority to support this unlikely theory, and both the ALJ and the Secretary correctly rejected it.

## III.   The Secretary correctly determined that petitioners were liable for violations of the Section 8 program.

The record also supports the Secretary's determination that petitioners violated their obligations under the Section 8 program.  The Secretary concluded that petitioners were liable for failing to provide subsidized tenants one year's notice before terminating the Housing Assistance contract or before raising rental amounts.  Sec. Op. 6-7; *see* 42 U.S.C. §§ 1437f(c)(8)(A), (B).  As part of these determinations, the Secretary properly rejected petitioners' claims that 1) once their Housing Assistance contract with HUD expired in July 2011, they were no longer subject to the one-year notice requirements, and 2) petitioners never in fact increased the rent.  Pet. Br. 31-32.

With regard to the notice requirement, petitioners simply misunderstand the source of their legal obligations. The notice requirement arises not just from the Housing Assistance contracts but from statute and regulation. *See* 42 U.S.C. § 1437f(c)(8)(B) ("In the event the owner does not provide the notice required, the owner may not evict the tenants or increase the tenants' rent payment until such time as the owner has provided the notice and 1 year has elapsed."); 24 C.F.R. § 402.8(b) (owner must "permit the tenants in assisted units to remain in their units at a rental rate no higher than the tenant rent payable for the tenants' last month of assisted occupancy under the terminated Housing Assistance contract until one year after notice is given, *even if HUD does not continue to make housing assistance payments with respect to such units*") (emphasis added). Because petitioners were at all relevant times subject to the statutory and regulatory obligations not to raise the rent of their Section 8 tenants, their rental increase in 2011 was plainly contrary to law. *See Park Vill. Apts. Tenants Ass'n v. Mortimer Howard Trust*, No. 06-7389, 2007 WL 519038, at *6 (N.D. Cal. Feb. 14, 2007) (rejecting argument that expiration of Housing Assistance contract voids statutory notice obligation).

36

It is likewise clear that petitioners in fact raised rent prices. Petitioners allege that in various situations they reduced *overall* rents, Pet. Br. 32, but the legal obligation not to increase rent applies to the *tenants' actual portion* of the rent.[13]  *See* 42 U.S.C. § 1437f(c)(8)(B) ("owner may not . . . increase the *tenants' rent payment* until such time as the owner has provided the notice and 1 year has elapsed") (emphasis added); 24 C.F.R. § 402.8(b) (owner must maintain "a rental rate no higher than the *tenant rent payable* for the tenants' last month of assisted occupancy") (emphasis added).  Once petitioners let the Housing Assistance contract expire in July 2011, HUD no longer provided rental subsidies and tenants became responsible for *all* of the rent payments rather than, as before, just the portion remaining after HUD's subsidy.  Petitioners never address this change in their tenants' payment share and instead argue only that petitioners never reduced the overall amount they charged.  Pet. Br. 32. Regardless, it is clear that petitioners increased tenants' rents without notice in violation of statute and regulation.

---

[13] The tenant's portion of rent is determined in accordance with a formula that takes into account the income of the assisted family.  *See generally* 42 U.S.C. §§ 1437a(a), 1437f(c)(3).

Petitioners suggest that HUD prevented them from renewing their

Housing Assistance contracts, Pet. Br. 32, but this is plainly refuted by the

record.  Petitioners not only allowed the contracts to lapse, but refused to

execute renewal contracts when given the opportunity by HUD.  RR2, Doc.

072, pp. 536-39, 639-46;  RR2, Doc. 073, p. 805; RR2, Doc. 105, Ex. 32; *see* 42

U.S.C. § 1437f(c)(8)(D) (defining "termination" to include an owner's

refusal to renew the contract).  Regardless, there is no dispute that the

contract in fact expired, and this is what triggers the notice requirement.

*See* 42 U.S.C. § 1437f(c)(8)(D) ("'termination' means the expiration of the

contract); *Park Vill. Apts.*, 2007 WL 519038, at *6 (ruling that "expiration" of

Housing Assistance contract triggers statutory notice requirement even if

HUD allowed contract to expire).

## IV.    The Secretary imposed appropriate penalties for petitioners' various violations.

The factors to be considered in determining the amount of the

penalty, if any, include: (a) the gravity of the offense; (b) any history of

prior offenses; (c) the ability to pay the penalty; (d) injury to the public; (e)

any benefits received by the violator; (f) extent of potential benefit to other

persons; (g) deterrence of future violations; (h) degree of violator's

culpability; (i) a factor applicable to Urban Homestead violations; (j) such other matters as justice may require; and (k) with respect to violations by section 8 owners, any injury to tenants.  24 C.F.R. § 30.80.

The Secretary applied these factors and penalized petitioners jointly and severally for $262,500, and petitioner Mantua Gardens for $1,260,000. In imposing these penalties, the Secretary vacated the two penalty reductions applied by the ALJ based on the "ability to pay" and "such other matters as justice may require."  The ALJ had applied the ability to pay factor to reduce Mantua Gardens' penalty from $2,325,000 to $450,000, and the ALJ also reduced all penalties by 25% based on a finding that HUD had conducted its penalty analysis in bad faith.

## A. The Secretary properly applied the "ability to pay" factor.

The ability to pay is "determined based on an assessment of the [party]'s resources available both presently and prospectively from which the Department could ultimately recover the total award."  24 C.F.R. § 30.10.  An ability to pay is presumed unless a party raises it as an affirmative defense and provides documentary evidence, 24 C.F.R. §§ 30.75(b), 30.80(c), and if raised the defense must be proven by a preponderance of the evidence.  24 C.F.R. § 26.45(e); *see In re Lord Commons*

*Apartments, LLC*, HUDALJ 05-060-CMP at 8 (July 20, 2007) ("Respondents have the burden to show that they are unable to pay a penalty because that information is within their knowledge and control").

As a preliminary matter, petitioners do not dispute that the ability-to-pay defense does not apply to Grier. Neither the ALJ nor the Secretary found any evidence warranting such a defense, and the ALJ in fact found that Grier intentionally failed to provide such evidence as part of a "pattern of delay and obfuscation." ALJ Op. 25. The ALJ noted: "Grier has flagrantly disobeyed Court Orders requiring him to submit an Assets Affidavit so the Court can gain an accurate understanding of his economic viability," and "the Court is now convinced that [] Grier never intended to file an Assets Affidavit, and is instead deliberately attempting to conceal his financial resources." *Id.* Grier's ability to pay is therefore presumed, and the record supports the joint and several penalty of $262,500.

Petitioners do challenge Mantua Gardens' ability to pay, but they have not met their burden of proving this defense. Mantua Gardens' primary asset was the Mantua Project, which was valued at $1.5 million. Beyond this information, petitioners presented nothing to suggest they could not pay HUD's requested penalty. Though they alleged general

40

financial difficulties,[14] the ALJ found that they "introduced *no evidence whatsoever* to substantiate their claims of financial vulnerability."  ALJ 25 (emphasis added).  Petitioners never presented financial statements confirmed by independent auditors nor any other reliable information reflecting their financial status.

Under these circumstances, the Secretary's penalty determination simply recognized that a party cannot cite its inability to pay as a basis for mitigating damages while at the same time refusing to provide any evidence of its finances.  *See In re Entercare*, HUDALJ 01-061-CMP (Dec. 31, 2002) (imposing maximum penalty and rejecting ability-to-pay defense where party repeatedly failed to provide complete statement of financial health); *see also Campbell v. United States*, 365 U.S. 85, 96 (1961) (The court does not place the "burden upon a litigant of establishing facts peculiarly within the knowledge of his adversary.").

---

[14] Among the financial difficulties alleged by petitioners is that "Mantua Gardens was in such dire financial condition that the Mortgage holder was threatening foreclosure."  Pet. Br. 21.  However, it was Grier's own company, Mantua LLC, that was threatening Mantua Gardens with foreclosure.  RR2, Doc. 105, Ex. 37.

Even assuming petitioners had established their financial difficulties, this still would not warrant mitigated damages under the "ability to pay" factor. Undoubtedly, the penalty imposed by the Secretary will harm petitioners. But some measure of harm is *prescribed* by the regulations. 24 C.F.R. § 30.80(g) (requiring consideration of "deterrence" as a factor in assessing penalties). Considering deterrence assures that "[t]he penalties assessed [will] be greater than the benefits enjoyed from non-compliance with the law; otherwise mortgagors may be tempted to believe that it 'pays' to violate the law, and the penalties will have no deterrent value." *In re Yetiv*, HUDALJ 02-001-CMP at 18 (Sept. 2, 2003). Courts have accordingly recognized that "difficulty paying is not inability to pay, and a painless sanction would have little deterrent effect." *Krueger v. Cuomo*, 115 F.3d 487, 493 (7th Cir. 1997) (assessing inability to pay in context of penalties under the Fair Housing Act).

On a similar note, the "ability to pay" factor is not meant to ensure a party's financial survival. Rather, it is defined by what the government can collect. The regulation prescribes an "assessment of the [party]'s resources available both presently and prospectively from which the Department *could ultimately recover the total award*," and it makes no reference to a

42

party's solvency.  24 C.F.R. § 30.10 (emphasis added).  In this respect, even the ALJ admitted that "the mere fact that a penalty might drive a respondent past the point of insolvency does not militate against authorizing such a penalty when it is justified."  ALJ 26 (citing *In re Entercare*, HUDALJ 01-061-CMP).  To the extent *other* factors might warrant consideration of a party's survival, both the ALJ's and Secretary's assessments of those factors were not favorable to petitioners, as discussed below.

### B. The Secretary properly applied the "such other matters as justice may require" factor.

The Secretary likewise correctly applied the "such other matters as justice may require" factor in vacating the ALJ's 25% reduction in penalty. The ALJ had applied the 25% reduction based on his finding that HUD had acted in bad faith by selecting a penalty "specifically calculated to bring financial ruin upon [petitioners]" rather than "to hold [them] accountable for their improper conduct."  ALJ Op. 15.  The Secretary correctly vacated this reduction, concluding that the ALJ had misinterpreted HUD's testimony regarding its analysis of the penalty factors, and determining

43

that HUD had appropriately considered those factors in selecting its proposed penalty.  Sec. Op. 11-13.

Federal officials acting within their official responsibility are generally presumed to be acting in good faith.  *Spezzaferro v. Fed. Aviation Admin.*, 807 F.2d 169, 173 (Fed. Cir. 1986); *see also In re Smith*, HUDALJ 91-1609-DB (LDP) (June 7, 1991).  This presumption can only be overcome by evidence establishing a clear abuse of discretion.  *In re Smith*, HUDALJ 91-1609-DB (LDP).

1.  Here, as an initial matter, the ALJ's bad faith finding was based on a misinterpretation of HUD's testimony.  The finding relied primarily on the following testimony describing HUD's penalty analysis from Ms. Shank, a director in HUD's enforcement center:

> I think where we came from it was looking at, "Well, what is the property worth?" and the combined amount for the HAP contracts is about what the property may be worth.  The idea might be that it would be appropriate to force the sale of the property from [petitioners] to another nonprofit to run it in a way that is in accordance with our requirements.

RR2, Doc. 071, p. 240.  The ALJ interpreted this testimony as revealing that HUD had "identified $1.5 million as the proverbial 'knockout blow,' and

44

therefore the government's initial request of $1.6 million[15] could not be a "mere coincidence."  ALJ Op. 16.

But when placed in context, Ms. Shank's testimony reveals that HUD actually used Mantua Gardens' finances to *reduce* HUD's proposed penalty using the "ability to pay" factor.  Specifically, prior to Ms. Shank's testimony above, the ALJ asked her what the maximum penalty was for Mantua Gardens' failure to provide notice of rental increases (alleged in Counts 55-99).  RR2, Doc. 071, p. 240.  Ms. Shank replied that the maximum penalty was $25,000 per count, but that "[t]here was a decision to reduce that amount."  *Id.*  The ALJ replied, "what I'm interested in is how HUD came to that," *id.*, and this led to Ms. Shank's statement set forth above. Given this context, it is clear that, to the extent HUD factored the value of the Mantua Project, it was to *reduce* Mantua Gardens' penalty to an amount it could plausibly pay.  As a result, HUD did not seek the $25,000

---

[15] It is not clear why the ALJ focused on HUD's initial request of $1.6 million.  HUD reduced this request early in administrative proceedings in its post-hearing brief, in which it proposed a penalty of $212,500 against petitioners jointly and severally, and $1,260,000 against Mantua Gardens, resulting in a total penalty of $1,472,500 against petitioners.  RR2, Doc. 081, pp. 23-25.  HUD has consistently asked for this reduced penalty since that time.

maximum penalty for Counts 55-99 but instead sought the reduced amount of $15,000 per count.

Other testimony from Ms. Shank also confirms that Mantua Gardens' finances were but one of many factors that HUD considered in selecting an appropriate penalty:

> . . . and those regulatory factors, they are tough. I mean, that's one of the problems. You know, to the extent that we look at we know certain things, we know how egregious it is. We can say, "We don't want this to happen, and we want to deter others from doing this in the future." We can say, "We think this property has a value of a million and a half, so to the extent that if we were to get different management, different owner, it could be used for the purpose of low-income housing," continue to use that if it would be sold to someone else. But you're right. I think there was a balancing here, and to the extent that $25,000 was asked for, I think it incorporated the severity, the fact that these were knowing, intentional violations, the fact that tenants were hurt.

RR2, Doc. 071, p. 240; *see also* RR2, Doc. 071, pp. 241-48 (elaborating on HUD's analysis of the penalty factors). This testimony makes clear that HUD's penalty analysis was far from a calculated effort solely to "bring financial ruin upon" petitioners. *See* ALJ Op. 15. Rather, it was a struggle to consider the various regulatory factors and ultimately calibrate a penalty

that sufficiently addressed petitioners' egregious conduct and redress the injuries suffered by petitioners' tenants.

2.  It is, moreover, entirely appropriate for HUD to consider Mantua Gardens' financial resources to help shape a sufficient penalty.  As discussed above, the deterrence factor in the penalty analysis *requires* that HUD fashion a penalty with an eye towards preventing future violations. The ALJ himself recognized the particular need for deterrence in penalizing petitioners' egregious actions: "[t]he sheer brazenness of [petitioner]'s scheme also strongly supports a sizeable penalty as a means to deter other would-be violators.  [Petitioner] Grier believed he had found a loophole in HUD's regulations that would allow him to use the Mantua Gardens East Project for his own purposes.  Had he succeeded, others would surely have attempted to follow his example.  The penalty imposed on these [petitioners] should dissuade others from making such an attempt."  ALJ 27.

Relatedly, there is little dispute as to the egregiousness of petitioners' violations.  The ALJ in fact found that the violations warranted even more severe penalties than those proposed by HUD.  After conducting his penalty analysis, in which he considered the gravity of the offense, the

47

injury to the public, the deterrence of future violations, and the degree of

petitioners' culpability, among other factors, the ALJ found petitioners

jointly and severally liable for $50,000 *more* than the amount requested by

the government, and Mantua Gardens liable for $1,065,000 *more* than the

amount requested by the government, before later reducing those

penalties.  As part of this analysis, the ALJ applied the maximum penalty

for *each* of the ten violations alleged against petitioners, though HUD had

proposed the maximum penalty for only three.

Given the scope and severity of petitioners' misconduct, it is

unsurprising that HUD has an interest in seeing its penalties enforced

against petitioners.  This is neither uncommon nor improper in the context

of prosecution.  As the Supreme Court has recognized, "[p]rosecutors need

not be entirely neutral and detached . . . . the strict requirements of

neutrality cannot be the same for administrative prosecutors as for judges,

whose duty it is to make the final decision and whose impartiality serves as

the ultimate guarantee of a fair and meaningful proceeding in our

constitutional regime." *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 247-50 (1980).

Given this broad discretion, and petitioners' extensive violations, the

Secretary properly determined that HUD conducted an appropriate

48

penalty analysis.  The record certainly does not suggest that HUD officials committed a clear abuse of discretion to overcome their presumption of good faith.  *See In re Smith*, HUDALJ 91-1609-DB (LDP).

3.  Petitioners' sole challenge to the Secretary's no-bad-faith determination is that it did not afford appropriate deference to the ALJ.  Pet. Br. 24-27.  However, petitioners do not dispute that on appeal the Secretary had "*all* the powers [he] would have in making the initial decision," 5 U.S.C. § 557(b) (emphasis added), and was "free to adopt or reject the ALJ's findings and conclusions of law," *HUD v. Corey*, HUDALJ 11-M-207-FH-27 at 2 n.2 (July 16, 2012).  Nor do petitioners question the Secretary's regulatory power to ultimately "affirm, modify, reduce, reverse, compromise, remand, or settle any relief granted in the initial decision."  24 C.F.R. § 26.52(k).

Despite the Secretary's broad discretion on review, petitioners maintain that his decision is subject to "heightened scrutiny" because he rejected the ALJ's assessment of witness credibility based on live

49

testimony.[16]  Pet. Br. 15-16 (citing *Aylett v. Sec'y of Hous. & Urban Dev.*, 54

F.3d 1560, 1566, 1567 (10th Cir.)).  But this argument misunderstands the

ALJ's and Secretary's determinations.  The Secretary and ALJ did not

disagree about the credibility of HUD testimony, but the significance of it.

That is, both the Secretary and ALJ *believed* Ms. Shank's testimony

concerning the process employed by HUD to assess penalties.  They simply

disagreed about the testimony's meaning.  This disagreement was, as set

forth above, largely due to the ALJ's failure to consider the testimony in its

proper context.  Regardless, the Secretary's reversal of the ALJ's bad faith

finding was based on the interpretation and weight of the evidence, and on

these points the Secretary owed the ALJ no deference at all.   *See* 5 U.S.C.

§ 557(b); *Penasquitos Vill., Inc. v. N.L.R.B.*, 565 F.2d 1074, 1078 (9th Cir. 1977)

(recognizing distinction between deference owed to testimonial inferences,

---

[16] As part of this argument, petitioners allege that that Secretary erred by "[r]elying only the content of Ms. Shank's testimony . . . with no reference to any other witnesses, or to any observations of any witness's demeanor or credibility."  Pet. Br. 8.  However, Ms. Shank's testimony was the only testimony cited in the ALJ's bad faith finding, *see* ALJ 15-16, 27, and it was the only testimony offered by HUD with respect to the agency's penalty analysis.  It was, therefore, the only testimony that the Secretary *could* rely on to reverse the ALJ's 25% penalty reduction.

which are credibility determinations based on  demeanor, and derivative

inferences, which are drawn from the evidence itself).

## CONCLUSION

For the foregoing reasons, the petition for review should be

dismissed for lack of appellate jurisdiction or, in the alternative, denied.

Respectfully submitted,

*Of Counsel:*

STUART F. DELERY
  *Assistant Attorney General*

ANA FABREGAS
  *Senior Trial Attorney*
  *U.S. Department of Housing*
  *And Urban Development*
  *451 Seventh St. SW*
  *Washington, DC 20410*

s/ Imran R. Zaidi
MICHAEL JAY SINGER
  *(202) 514-5432*
IMRAN R. ZAIDI
  *(202) 305-4241*
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7209*
  *U.S. Department of Justice*
  *950 Pennsylvania Ave., N.W.*
  *Washington, D.C.  20530*

JUNE 2014

52

## CERTIFICATE OF COMPLIANCE

I hereby certify pursuant to Fed. R. App. P. 32(a) that the foregoing

brief contains 10,068 words.

s/ Imran Zaidi
_____
Imran Zaidi

## CERTIFICATE OF SERVICE

I hereby certify that on June 27, 2014, I electronically filed the

foregoing brief with the Clerk of the Court for the United States Court of

Appeals for the District of Columbia Circuit by using the appellate

CM/ECF system.  Participants in the case are registered CM/ECF users

and service will be accomplished by the appellate CM/ECF system.

         s/ Imran Zaidi

        Imran Zaidi

**ADDENDUM**

## TABLE OF CONTENTS

12 U.S.C. § 1715z-1 ................................................................A1

42 U.S.C. §§ 1437f(a), (b), (c) ............................................A23

12 U.S.C. § 1735f-15 ..........................................................A31

## 12 U.S.C. § 1715z-1. Rental and cooperative housing for lower income families

(a) Authorization for periodic interest reduction payments on behalf of owner of rental housing project

For the purpose of reducing rentals for lower income families, the Secretary is authorized to make, and to contract to make, periodic interest reduction payments on behalf of the owner of a rental housing project designed for occupancy by lower income families, which shall be accomplished through payments to morgagees [FN1] holding mortgages meeting the special requirements specified in this section.

(b) Restrictions on payments; payments with respect to projects financed under State or local programs; mortgage insurance premium

Interest reduction payments with respect to a project shall only be made during such time as the project is operated as a rental housing project and is subject to a mortgage which meets the requirements of, and is insured under, subsection (j) of this section: *Provided,* That the Secretary is authorized to continue making such interest reduction payments where the mortgage has been assigned to the Secretary: *Provided further,* That interest reduction payments may be made with respect to a mortgage or part thereof on a rental or cooperative housing project owned by a private nonprofit corporation or other private nonprofit entity, a limited dividend corporation or other limited dividend entity, public [FN2] entity, or a cooperative housing corporation, which is financed under a State or local program providing assistance through loans, loan insurance, or tax abatements, and which may involve either new or existing construction and which is approved for receiving the benefits of this section. The term "mortgage insurance premium", when used in this section in relation to a project financed by a loan under a State or local program, means such fees and charges, approved by the Secretary, as are payable by the mortgagor to the State or local agency mortgagee to meet reserve requirements and administrative expenses of such agency.

A1

(c) Amount of payments

The interest reduction payments to a mortgagee by the Secretary on behalf of a project owner shall be in an amount not exceeding the difference between the monthly payment for principal, interest, and mortgage insurance premium which the project owner as a mortgagor is obligated to pay under the mortgage and the monthly payment for principal and interest such project owner would be obligated to pay if the mortgage were to bear interest at the rate of 1 per centum per annum.

(d) Mortgage handling expenses

The Secretary may include in the payment to the mortgagee such amount, in addition to the amount computed under subsection (c) of this section, as he deems appropriate to reimburse the mortgagee for its expenses in handling the mortgage.

(e) Operation of project in accordance with requirements respecting tenant eligibility and rents prescribed by Secretary

   (1) As a condition for receiving the benefits of interest reduction payments, the project owner shall operate the project in accordance with such requirements with respect to tenant eligibility and rents as the Secretary may prescribe. Procedures shall be adopted by the Secretary for review of tenant incomes at intervals of one year (or at shorter intervals where the Secretary deems it desirable).

   (2) A project for which interest reduction payments are made under this section and for which the mortgage on the project has been refinanced shall continue to receive the interest reduction payments under this section under the terms of the contract for such payments, but only if the project owner enters into such binding commitments as the Secretary may require (which shall be applicable to any subsequent owner) to ensure that the owner will continue to operate the project in accordance with all low-income affordability restrictions for the project in connection with the Federal assistance for the project for a period

A2

having a duration that is not less than the term for which such interest reduction payments are made plus an additional 5 years.

(f) Establishment of basic and fair market rental charges; rental for dwelling units; separate utility metering; additional assistance payments for low-income tenants; limitations; amounts; approval of payments

(1)(A)(i) For each dwelling unit there shall be established, with the approval of the Secretary, a basic rental charge and fair market rental charge.

(ii) The basic rental charge shall be--

(I) the amount needed to operate the project with payments of principal and interest due under a mortgage bearing interest at the rate of 1 percent per annum; or

(II) an amount greater than that determined under clause (ii)(I), but not greater than the market rent for a comparable unassisted unit, reduced by the value of the interest reduction payments subsidy.

(iii) The fair market rental charge shall be--

(I) the amount needed to operate the project with payments of principal, interest, and mortgage insurance premium which the mortgagor is obligated to pay under the mortgage covering the project; or

(II) an amount greater than that determined under clause (iii)(I), but not greater than the market rent for a comparable unassisted unit.

(iv) The Secretary may approve a basic rental charge and fair market rental charge for a unit that exceeds the minimum amounts permitted by this subparagraph for such charges only if--

A3

(I) the approved basic rental charge and fair market rental charges each exceed the applicable minimum charge by the same amount; and

(II) the project owner agrees to restrictions on project use or mortgage prepayment that are acceptable to the Secretary.

(v) The Secretary may approve a basic rental charge and fair market rental charge under this paragraph for a unit with assistance under section 1437f of Title 42 that differs from the basic rental charge and fair market rental charge for a unit in the same project that is similar in size and amenities but without such assistance, as needed to ensure equitable treatment of tenants in units without such assistance.

(B)(i) The rental charge for each dwelling unit shall be at the basic rental charge or such greater amount, not exceeding the fair market rental charge determined pursuant to subparagraph (A), as represents 30 percent of the tenant's adjusted income, except as otherwise provided in this subparagraph.

(ii) In the case of a project which contains more than 5000 units, is subject to an interest reduction payments contract, and is financed under a State or local project, the Secretary may reduce the rental charge ceiling, but in no case shall the rental charge be below the basic rental charge set forth in subparagraph (A)(ii)(I).

(iii) For plans of action approved for capital grants under the Low-Income Housing Preservation and Resident Homeownership Act of 1990 or the Emergency Low Income Housing Preservation Act of 1987 [12 U.S.C.A. § 4101 et seq.], the rental charge for each dwelling unit shall be at the minimum basic rental charge set forth in subparagraph (A)(ii)(I) or such greater amount, not exceeding the lower of: (I) the fair market rental charge set forth in subparagraph (A)(iii)(I); or (II) the actual rent paid for a comparable unit in comparable unassisted housing in the market area in which the

A4

housing assisted under this section is located, as represents 30 percent of the tenant's adjusted income.

(C) With respect to those projects which the Secretary determines have separate utility metering paid by the tenants for some or all dwelling units, the Secretary may

(i) permit the basic rental charge and the fair market rental charge to be determined on the basis of operating the project without the payment of the cost of utility services used by such dwelling units; and

(ii) permit the charging of a rental for such dwelling units at such an amount less than 30 percent of a tenant's adjusted income as the Secretary determines represents a proportionate decrease for the utility charges to be paid by such tenant, but in no case shall rental be lower than 25 percent of a tenant's adjusted income.

(2) With respect to 20 per centum of the dwelling units in any project made subject to a contract under this section after August 22, 1974, the Secretary shall make, and contract to make, additional assistance payments to the project owner on behalf of tenants whose incomes are too low for them to afford the basic rentals (including the amount allowed for utilities in the case of a project with separate utility metering) with 30 per centum of their adjusted income. The additional assistance payments authorized by this paragraph with respect to any dwelling unit shall be the amount required to reduce the rental payment (including the amount allowed for utilities in the case of a project with separate utility metering) by the tenant to the highest of the following amounts, rounded to the nearest dollar:

(A) 30 per centum of the tenant's monthly adjusted income;

(B) 10 per centum of the tenant's monthly income; or

(C) if the family is receiving payments for welfare assistance from a public agency and a part of such payments, adjusted in

A5

accordance with the family's actual housing costs, is specifically designated by such agency to meet the family's housing costs, the portion of such payments which is so designated.

Notwithstanding the foregoing provisions of this paragraph, the Secretary may--

> (A) reduce such 20 per centum requirement in the case of any project if he determines that such action is necessary to assure the economic viability of the project; or

> (B) increase such 20 per centum requirement in the case of any project if he determines that such action is necessary and feasible in order to assure, insofar as is practicable, that there is in the project a reasonable range in the income levels of tenants, or that such action is to be taken to meet the housing needs of elderly or handicapped families.

(3) The Secretary shall utilize amounts credited to the fund described in subsection (g) of this section for the sole purpose of carrying out the purposes of section 201 of the Housing and Community Development Amendments of 1978. No payments may be made from such fund unless approved in an appropriation Act. No amount may be so approved for any fiscal year beginning after September 30, 1994.

(4) To ensure that eligible tenants occupying that number of units with respect to which assistance was being provided under this subsection immediately prior to November 30, 1983, receive the benefit of assistance contracted for under paragraph (2), the Secretary shall offer annually to amend contracts entered into under this subsection with owners of projects assisted but not subject to mortgages insured under this section to provide sufficient payments to cover 100 percent of the necessary rent increases and changes in the incomes of eligible tenants, subject to the availability of authority for such purpose under section 1437c(c) of Title 42. The Secretary shall take such actions as may be necessary to ensure that payments, including payments that reflect necessary rent increases

A6

and changes in the incomes of tenants, are made on a timely basis for all units covered by contracts entered into under paragraph (2).

(5)(A) In order to induce advances by owners for capital improvements (excluding any owner contributions that may be required by the Secretary as a condition for assistance under section 201 of the Housing and Community Development Amendments of 1978) to benefit projects assisted under this section, in establishing basic rental charges and fair market rental charges under paragraph (1) the Secretary may include an amount that would permit a return of such advances with interest to the owner out of project income, on such terms and conditions as the Secretary may determine. Any resulting increase in rent contributions shall be--

(i) to a level not exceeding the lower of 30 percent of the adjusted income of the tenant or the published existing fair market rent for comparable housing established under section 1437f(c) of Title 42;

(ii) phased in equally over a period of not less than 3 years, if such increase is 30 percent or more; and

(iii) limited to not more than 10 percent per year if such increase is more than 10 percent but less than 30 percent.

(B) Assistance under section 1437f of Title 42 shall be provided, to the extent available under appropriations Acts, if necessary to mitigate any adverse effects on income-eligible tenants.

(6) Repealed. Pub.L. 104-99, Title IV, § 405(d)(2), Jan. 26, 1996, 110 Stat. 45

(7) The Secretary shall determine whether and under what conditions the provisions of this subsection shall apply to mortgages sold by the Secretary on a negotiated basis.

(g) Collection of excess rental charges; credit to reserve for additional assistance payments; retention by project owner

A7

(1) The project owner shall, as required by the Secretary, accumulate, safeguard, and periodically pay the Secretary or such other entity as determined by the Secretary and upon such terms and conditions as the Secretary deems appropriate, all rental charges collected on a unit-by-unit basis in excess of the basic rental charges. Unless otherwise directed by the Secretary, such excess charges shall be credited to a reserve used by the Secretary to make additional assistance payments as provided in paragraph (3) of subsection (f) of this section.

(2) Notwithstanding any other requirements of this subsection, a project owner may retain some or all of such excess charges for project use if authorized by the Secretary. Such excess charges shall be used for the project and upon terms and conditions established by the Secretary, unless the Secretary permits the owner to retain funds for non-project use after a determination that the project is well-maintained housing in good condition and that the owner has not engaged in material adverse financial or managerial actions or omissions as described in section 516 of the Multifamily Assisted Housing Reform and Affordability Act of 1997. In connection with the retention of funds for non-project use, the Secretary may require the project owner to enter into a binding commitment (which shall be applicable to any subsequent owner) to ensure that the owner will continue to operate the project in accordance with all low-income affordability restrictions for the project in connection with the Federal assistance for the project for a period having a duration of not less than the term of the existing affordability restrictions plus an additional 5 years.

(3) The Secretary shall not withhold approval of the retention by the owner of such excess charges because of the existence of unpaid excess charges if such unpaid amount is being remitted to the Secretary over a period of time in accordance with a workout agreement with the Secretary, unless the Secretary determines that the owner is in violation of the workout agreement.

A8

(h) Rules and regulations

In addition to establishing the requirements specified in subsection (e) of this section, the Secretary is authorized to make such rules and regulations, to enter into such agreements, and to adopt such procedures as he may deem necessary or desirable to carry out the provisions of this section.

(i) Authorization of appropriations; aggregate amount of contracts; contracts for assistance payments; income limitations; availability of amounts for projects approved prior to rehabilitation and projects for occupancy by elderly or handicapped families; definitions

   (1) There are authorized to be appropriated such sums as may be necessary to carry out the provisions of this section, including such sums as may be necessary to make interest reduction payments under contracts entered into by the Secretary under this section. The aggregate amount of outstanding contracts to make such payments shall not exceed amounts approved in appropriation Acts, and payments pursuant to such contracts shall not exceed $75,000,000 per annum prior to July 1, 1969, which maximum dollar amount shall be increased by $125,000,000 on July 1, 1969, by $150,000,000 on July 1, 1970, by $200,000,000 on July 1, 1971, and by $75,000,000 on July 1, 1974. The Secretary shall utilize, to the extent necessary after September 30, 1984, any authority under this section that is recaptured either as the result of the conversion of housing projects covered by assistance under subsection (f)(2) of this section to contracts for assistance under section 1437f of Title 42 or otherwise for the purpose of making assistance payments, including amendments as provided in subsection (f)(4) of this section, with respect to housing projects assisted, but not subject to mortgages insured, under this section that remain covered by assistance under subsection (f)(2) of this section.

   (2) Contracts for assistance payments under this section may be entered into only with respect to tenants whose incomes do not exceed 80 per centum of the median family income for the area, as determined

A9

by the Secretary with adjustments for smaller and larger families, except that the Secretary may establish income ceilings higher or lower than 80 per centum of the median for the area on the basis of his findings that such variations are necessary because of prevailing levels of construction costs, unusually high or low family incomes, or other factors.

(3) Not less than 10 per centum of the total amount of contracts for assistance payments authorized by appropriation Acts to be made after June 30, 1974, shall be available for use only with respect to dwellings, or dwelling units in projects, which are approved by the Secretary prior to rehabilitation.

(4) At least 20 per centum of the total amount of contracts for assistance payments authorized in appropriation Acts to be made after June 30, 1974, shall be available for use only with respect to projects which are planned in whole or in part for occupancy by elderly or handicapped families. As used in this paragraph, the term "elderly families" means families which consist of two or more persons the head of which (or his spouse) is sixty-two years of age or over or is handicapped. Such term also means a single person who is sixty-two years of age or over or is handicapped. A person shall be considered handicapped if such person is determined, pursuant to regulations issued by the Secretary, to have an impairment which (A) is expected to be of long-continued and indefinite duration, (B) substantially impedes his ability to live independently, and (C) is of such a nature that such ability could be improved by more suitable housing conditions.

(j) Insurance of mortgages; definitions; eligibility for insurance; mortgage requirements; property or project requirements; sale of individual dwelling units; release of mortgagor from liability or release of property from lien of mortgage

(1) The Secretary is authorized, upon application by the mortgagee, to insure a mortgage (including advances on such mortgage during construction) which meets the requirements of this subsection.

A10

Commitments for the insurance of such mortgages may be issued by the Secretary prior to the date of their execution or disbursement thereon, upon such terms and conditions as he may prescribe.

(2) As used in this subsection--

    (A) the terms "family" and "families" shall have the same meaning as in section 1715*l* of this title;

    (B) the term "elderly or handicapped families" shall have the same meaning as in section 1701q of this title; and

    (C) the terms "mortgage", "mortgagee", and "mortgagor" shall have the same meaning as in section 1707 of this title.

(3) To be eligible for insurance under this subsection, a mortgage shall meet the requirements specified in subsections (d)(1) and (d)(3) of section 1715*l* of this title, except as such requirements are modified by this subsection. In the case of a project financed with a mortgage insured under this subsection which involves a mortgagor other than a cooperative or a private nonprofit corporation or association and which is sold to a cooperative or a nonprofit corporation or association, the Secretary is further authorized to insure under this subsection a mortgage given by such purchaser in an amount not exceeding the appraised value of the property at the time of purchase, which value shall be based upon a mortgage amount on which the debt service can be met from the income of the property when operated on a nonprofit basis, after payment of all operating expenses, taxes, and required reserves.

(4) A mortgage to be insured under this subsection shall--

    (A) be executed by a mortgagor eligible under subsection (d)(3) or (e) of section 1715*l* of this title;

    (B) bear interest at a rate not to exceed such percent per annum on the amount of the principal obligation outstanding at any time as the Secretary determines is necessary to meet the mortgage

A11

market, taking into consideration the yields on mortgages in the primary and secondary markets; and

(C) provide for complete amortization by periodic payments within such term as the Secretary may prescribe.

(5) The property or project shall--

(A) comply with such standards and conditions as the Secretary may prescribe to establish the acceptability of the property for mortgage insurance and may include such nondwelling facilities as the Secretary deems adequate and appropriate to serve the occupants and the surrounding neighborhood: *Provided,* That the project shall be predominantly residential and any nondwelling facility included in the mortgage shall be found by the Secretary to contribute to the economic feasibility of the project, and the Secretary shall give due consideration to the possible effect of the project on other business enterprises in the community: *Provided further,* That, in the case of a project designed primarily for occupancy by elderly or handicapped families, the project may include related facilities for use by elderly or handicapped families, including cafeterias or dining halls, community rooms, workshops, infirmaries, or other inpatient or outpatient health facilities, and other essential service facilities;

(B) include five or more dwelling units, but such units, in the case of a project designed primarily for occupancy by displaced, elderly, or handicapped families, need not, with the approval of the Secretary, contain kitchen facilities; and

(C) be designed primarily for use as a rental project to be occupied by lower income families or by elderly or handicapped families: *Provided,* That lower income persons who are less than sixty-two years of age shall be eligible for occupancy in such a project.

In any case in which it is determined in accordance with regulations of the Secretary that facilities in existence or under construction on December 31, 1970, which could appropriately be used for classroom purposes are

available in any such property or project and that public schools in the community are overcrowded due in part to the attendance at such schools of residents of the property or project, such facilities may be used for such purposes to the extent permitted in such regulations (without being subject to any of the requirements of the first proviso in subparagraph (A) except the requirement that the project be predominantly residential).

(6) With the approval of the Secretary, the mortgagor may sell the individual dwelling units to lower income or elderly or handicapped purchasers. The Secretary may consent to the release of the mortgagor from his liability under the mortgage and the credit instrument secured thereby, or consent to the release of parts of the mortgaged property from the lien of the mortgage, upon such terms and conditions as he may prescribe, and the mortgage may provide for such release.

(k) Definitions

As used in this section the term "tenant" includes a member of a cooperative; the term "rental housing project" includes a cooperative housing project; and the terms "rental" and "rental charge" mean, with respect to members of a cooperative, the charges under the occupancy agreements between such members and the cooperative.

(l) Allocation and transfer of reasonable portion of total authority to contract to make payments to Secretary of Agriculture for use in rural areas and small towns

The Secretary shall from time to time allocate and transfer to the Secretary of Agriculture, for use (in accordance with the terms and conditions of this section) in rural areas and small towns, a reasonable portion of the total authority to contract to make periodic interest reduction payments as approved in appropriation Acts under subsection (i) of this section.

(m) "Income" defined

For the purpose of this section the term "income" means income from all sources of each member of the household, as determined in accordance

A13

with criteria prescribed by the Secretary, except that any amounts not actually received by the family may not be considered as income under this subsection. In determining amounts to be excluded from income, the Secretary may, in the Secretary's discretion, take into account the number of minor children in the household and such other factors as the Secretary may determine are appropriate.

(n) Termination date for insurance of mortgages; exception

No mortgage shall be insured under this section after November 30, 1983, except pursuant to a commitment to insure before that date. A mortgage may be insured under this section after the date in the preceding sentence in order to refinance a mortgage insured under this section or to finance pursuant to subsection (j)(3) of this section the purchase, by a cooperative or nonprofit corporation or association, of a project assisted under this section.

(o) State funding of interest reduction payments

The Secretary is authorized to enter into agreements with any State or agency thereof under which such State or agency thereof contracts to make interest reduction payments, subject to all the terms and conditions specified in this section and in rules, regulations and procedures adopted by the Secretary under this section, with respect to all or a part of a project covered by a mortgage insured under this section. Any funds provided by a State or agency thereof for the purpose of making interest reduction payments shall be administered, disbursed and accounted for by the Secretary in accordance with the agreements entered into by the Secretary with the State or agency thereof and for such fees as shall be specified therein. Before entering into any agreements pursuant to this subsection the Secretary shall require assurances satisfactory to him that the State or agency thereof is able to provide sufficient funds for the making of interest reduction payments for the full period specified in the interest reduction contract.

(p) Contracts with State or local agencies for monitoring and supervision of management by private sponsors of assisted projects

A14

The Secretary is authorized to enter into contracts with State or local agencies approved by him to provide for the monitoring and supervision by such agencies of the management by private sponsors of projects assisted under this section. Such contracts shall require that such agencies promptly report to the Secretary any deficiencies in the management of such projects in order to enable the Secretary to take corrective action at the earliest practicable time.

(q) Assistance to residents of covered projects; contracting authority; applicability

The Secretary may provide assistance under section 1437f of Title 42 with respect to residents of units in a project assisted under this section. In entering into contracts under section 1437c(c) of Title 42 with respect to the additional authority provided on October 1, 1980, the Secretary shall not utilize more than $20,000,000 of such additional authority to provide assistance for elderly or handicapped families which, at the time of applying for assistance under such section 1437f of Title 42, are residents of a project assisted under this section and are expending more than 50 percent of their income on rental payments.

(r) Payments for benefit of certain projects having mortgages made by State or local housing finance or government agencies

The Secretary shall, not later than 45 days after receipt of an application by the mortgagee, provide interest reduction and rental assistance payments for the benefit of projects assisted under this section whose mortgages were made by State or local housing finance agencies or State or local government agencies for a term equal to the remaining mortgage term to maturity on projects assisted under this section to the extent of--

(1) unexpended balances of amounts of authority as set forth in certain letter agreements between the Department of Housing and Urban Development and such State or local housing finance agencies or State or local government agencies, and

(2) existing allocation under section 236 contracts on projects whose mortgages were made by State or local housing finance agencies or

A15

> State or local government agencies which are not being funded, to the extent of such excess allocation, for any purposes permitted under the provisions of this section, including without limitation rent supplement and rental assistance payment unit increases and mortgage increases for any eligible purpose under this section, including without limitation operating deficit loans.

An application shall be eligible for assistance under the previous sentence only if the mortgagee submits the application within 548 days after February 5, 1988, along with a certification of the mortgagee that amounts hereunder are to be utilized only for the purpose of either (A) reducing rents or rent increases to tenants, or (B) making repairs or otherwise increasing the economic viability of a related project. Unexpended balances referred to in the first sentence of this subsection which remain after disposition of all such applications is favorably concluded shall be rescinded. The calculation of the amount of assistance to be provided under an interest reduction contract pursuant to this subsection shall be made on the basis of an assumed mortgage term equal to the lesser of a 40-year amortization period or the term of that part of the mortgage which relates to the additional assistance provided under this subsection, even though the additional assistance may be provided for a shorter period. The authority conferred by this subsection to provide interest reduction and rental assistance payments shall be available only to the extent approved in appropriation Acts.

(s) Grants and loans for rehabilitation of multifamily projects

(1) In general

The Secretary may make grants and loans for the capital costs of rehabilitation to owners of projects that meet the eligibility and other criteria set forth in, and in accordance with, this subsection.

(2) Project eligibility

A project may be eligible for capital assistance under this subsection under a grant or loan only--

(A) if--

    (i) the project is or was insured under any provision of subchapter II of this chapter;

    (ii) the project was assisted under [section 1437f of Title 42](#) on October 27, 1997; and

    (iii**)** the project mortgage was not held by a State agency as of October 27, 1997;

(B) if the project owner agrees to maintain the housing quality standards as required by the Secretary;

(C) the project owner enters into such binding commitments as the Secretary may require (which shall be applicable to any subsequent owner) to ensure that the owner will continue to operate the project in accordance with all low-income affordability restrictions for the project in connection with the Federal assistance for the project for a period having a duration that is not less than the period referred to in paragraph (5)(C);

(D)(i) if the Secretary determines that the owner or purchaser of the project has not engaged in material adverse financial or managerial actions or omissions with regard to such project; or

    (ii) if the Secretary elects to make such determination, that the owner or purchaser of the project has not engaged in material adverse financial or managerial actions or omissions with regard to other projects of such owner or purchaser that are federally assisted or financed with a loan from, or mortgage insured or guaranteed by, an agency of the Federal Government;

    (iii) material adverse financial or managerial actions or omissions, as the terms are used in this subparagraph, include--

A17

(I) materially violating any Federal, State, or local law or regulation with regard to this project or any other federally assisted project, after receipt of notice and an opportunity to cure;

(II) materially breaching a contract for assistance under section 1437f of Title 42, after receipt of notice and an opportunity to cure;

(III) materially violating any applicable regulatory or other agreement with the Secretary or a participating administrative entity, after receipt of notice and an opportunity to cure;

(IV) repeatedly failing to make mortgage payments at times when project income was sufficient to maintain and operate the property;

(V) materially failing to maintain the property according to housing quality standards after receipt of notice and a reasonable opportunity to cure; or

(VI) committing any act or omission that would warrant suspension or debarment by the Secretary; and

(iv) the term "owner" as used in this subparagraph, in addition to it having the same meaning as in section 1437f(f) of Title 42, also means an affiliate of the owner; the term "purchaser" as used in this subsection means any private person or entity, including a cooperative, an agency of the Federal Government, or a public housing agency, that, upon purchase of the project, would have the legal right to lease or sublease dwelling units in the project, and also means an affiliate of the purchaser; the terms "affiliate of the owner" and "affiliate of the purchaser" means any person or entity (including, but not limited to, a general partner or managing member, or an officer of either) that controls an owner or purchaser, is controlled by an owner or purchaser, or is under common control with the owner or purchaser; the term "control" means the direct or indirect power (under contract, equity

A18

ownership, the right to vote or determine a vote, or otherwise) to direct the financial, legal, beneficial or other interests of the owner or purchaser; and

(E) if the project owner demonstrates to the satisfaction of the Secretary--

(i) using information in a comprehensive needs assessment, that capital assistance under this subsection from a grant or loan (as appropriate) is needed for rehabilitation of the project; and

(ii) that project income is not sufficient to support such rehabilitation.

(3) Eligible uses

Amounts from a grant or loan under this subsection may be used only for projects eligible under paragraph (2) for the purposes of--

(A) payment into project replacement reserves;

(B) debt service payments on non-Federal rehabilitation loans; and

(C) payment of nonrecurring maintenance and capital improvements, under such terms and conditions as are determined by the Secretary.

(4) Grant and loan agreements

(A) In general

The Secretary shall provide in any grant or loan agreement under this subsection that the grant or loan shall be terminated if the project fails to meet housing quality standards, as applicable on October 27, 1997, or any successor standards for the physical conditions of projects, as are determined by the Secretary.

(B) Affordability and use clauses

A19

The Secretary shall include in a grant or loan agreement under this subsection a requirement for the project owners to maintain such affordability and use restrictions as the Secretary determines to be appropriate and consistent with paragraph (2)(C).

(C) Other terms

The Secretary may include in a grant or loan agreement under this subsection such other terms and conditions as the Secretary determines to be necessary.

(5) Loan terms

A loan under this subsection--

(A) shall provide amounts for the eligible uses under paragraph (3) in a single loan disbursement of loan principal;

(B) shall be repaid, as to principal and interest, on behalf of the borrower using amounts recaptured from contracts for interest reduction payments pursuant to clause (i) or (ii) of paragraph (7)(A);

(C) shall have a term to maturity of a duration not shorter than the remaining period for which the interest reduction payments for the insured mortgage or mortgages that fund repayment of the loan would have continued after extinguishment or writedown of the mortgage (in accordance with the terms of such mortgage in effect immediately before such extinguishment or writedown);

(D) shall bear interest at a rate, as determined by the Secretary of the Treasury, that is based upon the current market yields on outstanding marketable obligations of the United States having comparable maturities; and

(E) shall involve a principal obligation of an amount not exceeding the amount that can be repaid using amounts described in subparagraph (B) over the term determined in accordance with

A20

subparagraph (C), with interest at the rate determined under subparagraph (D).

(6) Delegation

    (A) In general

In addition to the authorities set forth in subsection (p) of this section, the Secretary may delegate to State and local governments the responsibility for the administration of grants under this subsection. Any such government may carry out such delegated responsibilities directly or under contracts.

    (B) Administration costs

In addition to other eligible purposes, amounts of grants under this subsection may be made available for costs of administration under subparagraph (A).

(7) Funding

    (A) In general

For purposes of carrying out this subsection, the Secretary may make available amounts that are unobligated amounts for contracts for interest reduction payments--

        (i) that were previously obligated for contracts for interest reduction payments under this section until the insured mortgage under this section was extinguished;

        (ii) that become available as a result of the outstanding principal balance of a mortgage having been written down;

        (iii) that are uncommitted balances within the limitation on maximum payments that may have been, before October 27, 1997, permitted in any fiscal year; or

        (iv) that become available from any other source.

A21

(B) Liquidation authority

The Secretary may liquidate obligations entered into under this subsection under section 1305(10) of Title 31.

(C) Capital grants

In making capital grants under the terms of this subsection, using the amounts that the Secretary has recaptured from contracts for interest reduction payments, the Secretary shall ensure that the rates and amounts of outlays do not at any time exceed the rates and amounts of outlays that would have been experienced if the insured mortgage had not been extinguished or the principal amount had not been written down, and the interest reduction payments that the Secretary has recaptured had continued in accordance with the terms in effect immediately prior to such extinguishment or write-down.

(D) Loans

In making loans under this subsection using the amounts that the Secretary has recaptured from contracts for interest reduction payments pursuant to clause (i) or (ii) of paragraph (7)(A)--

> (i) the Secretary may use such recaptured amounts for costs (as such term is defined in section 661a of Title 2) of such loans; and

> (ii) the Secretary may make loans in any fiscal year only to the extent or in such amounts that amounts are used under clause (i) to cover costs of such loans.

A22

**42 U.S.C. § 1437f. Low-income housing assistance**

(a) Authorization for assistance payments

For the purpose of aiding low-income families in obtaining a decent place to live and of promoting economically mixed housing, assistance payments may be made with respect to existing housing in accordance with the provisions of this section.

(b) Other existing housing programs

(1) In general

The Secretary is authorized to enter into annual contributions contracts with public housing agencies pursuant to which such agencies may enter into contracts to make assistance payments to owners of existing dwelling units in accordance with this section. In areas where no public housing agency has been organized or where the Secretary determines that a public housing agency is unable to implement the provisions of this section, the Secretary is authorized to enter into such contracts and to perform the other functions assigned to a public housing agency by this section.

(2) The Secretary is authorized to enter into annual contributions contracts with public housing agencies for the purpose of replacing public housing transferred in accordance with subchapter II-A of this chapter. Each contract entered into under this subsection shall be for a term of not more than 60 months.

(c) Contents and purposes of contracts for assistance payments; amount and scope of monthly assistance payments

(1) An assistance contract entered into pursuant to this section shall establish the maximum monthly rent (including utilities and all maintenance and management charges) which the owner is entitled to receive for each dwelling unit with respect to which such assistance payments are to be made. The maximum monthly rent shall not exceed by more than 10 per centum the fair market rental established by the Secretary periodically but not less than annually for existing or newly

A23

constructed rental dwelling units of various sizes and types in the market area suitable for occupancy by persons assisted under this section, except that the maximum monthly rent may exceed the fair market rental (A) by more than 10 but not more than 20 per centum where the Secretary determines that special circumstances warrant such higher maximum rent or that such higher rent is necessary to the implementation of a housing strategy as defined in section 12705 of this title, or (B) by such higher amount as may be requested by a tenant and approved by the public housing agency in accordance with paragraph (3)(B). In the case of newly constructed and substantially rehabilitated units, the exception in the preceding sentence shall not apply to more than 20 per centum of the total amount of authority to enter into annual contributions contracts for such units which is allocated to an area and obligated with respect to any fiscal year beginning on or after October 1, 1980. Proposed fair market rentals for an area shall be published in the Federal Register with reasonable time for public comment, and shall become effective upon the date of publication in final form in the Federal Register. Each fair market rental in effect under this subsection shall be adjusted to be effective on October 1 of each year to reflect changes, based on the most recent available data trended so the rentals will be current for the year to which they apply, of rents for existing or newly constructed rental dwelling units, as the case may be, of various sizes and types in the market area suitable for occupancy by persons assisted under this section. Notwithstanding any other provision of this section, after October 12, 1977, the Secretary shall prohibit high-rise elevator projects for families with children unless there is no practical alternative. The Secretary shall establish separate fair market rentals under this paragraph for Westchester County in the State of New York. The Secretary shall also establish separate fair market rentals under this paragraph for Monroe County in the Commonwealth of Pennsylvania. In establishing fair market rentals for the remaining portion of the market area in which Monroe County is located, the Secretary shall establish the fair market rentals as if such portion included Monroe County. If units assisted under this section are exempt from local rent control while they are so assisted or otherwise, the maximum monthly

A24

rent for such units shall be reasonable in comparison with other units in the market area that are exempt from local rent control.

(2)(A) The assistance contract shall provide for adjustment annually or more frequently in the maximum monthly rents for units covered by the contract to reflect changes in the fair market rentals established in the housing area for similar types and sizes of dwelling units or, if the Secretary determines, on the basis of a reasonable formula. However, where the maximum monthly rent, for a unit in a new construction, substantial rehabilitation, or moderate rehabilitation project, to be adjusted using an annual adjustment factor exceeds the fair market rental for an existing dwelling unit in the market area, the Secretary shall adjust the rent only to the extent that the owner demonstrates that the adjusted rent would not exceed the rent for an unassisted unit of similar quality, type, and age in the same market area, as determined by the Secretary. The immediately foregoing sentence shall be effective only during fiscal year 1995, fiscal year 1996 prior to April 26, 1996, and fiscal years 1997 and 1998, and during fiscal year 1999 and thereafter. Except for assistance under the certificate program, for any unit occupied by the same family at the time of the last annual rental adjustment, where the assistance contract provides for the adjustment of the maximum monthly rent by applying an annual adjustment factor and where the rent for a unit is otherwise eligible for an adjustment based on the full amount of the factor, 0.01 shall be subtracted from the amount of the factor, except that the factor shall not be reduced to less than 1.0. In the case of assistance under the certificate program, 0.01 shall be subtracted from the amount of the annual adjustment factor (except that the factor shall not be reduced to less than 1.0), and the adjusted rent shall not exceed the rent for a comparable unassisted unit of similar quality, type, and age in the market area. The immediately foregoing two sentences shall be effective only during fiscal year 1995, fiscal year 1996 prior to April 26, 1996, and fiscal years 1997 and 1998, and during fiscal year 1999 and thereafter. In establishing annual adjustment factors for units in new construction and substantial rehabilitation projects, the Secretary shall take into account the fact that debt service is a fixed expense. The immediately foregoing sentence shall be effective only during fiscal year 1998.

A25

(B) The contract shall further provide for the Secretary to make additional adjustments in the maximum monthly rent for units under contract to the extent he determines such adjustments are necessary to reflect increases in the actual and necessary expenses of owning and maintaining the units which have resulted from substantial general increases in real property taxes, utility rates, or similar costs which are not adequately compensated for by the adjustment in the maximum monthly rent authorized by subparagraph (A). The Secretary shall make additional adjustments in the maximum monthly rent for units under contract (subject to the availability of appropriations for contract amendments) to the extent the Secretary determines such adjustments are necessary to reflect increases in the actual and necessary expenses of owning and maintaining the units that have resulted from the expiration of a real property tax exemption. Where the Secretary determines that a project assisted under this section is located in a community where drug-related criminal activity is generally prevalent and the project's operating, maintenance, and capital repair expenses have been substantially increased primarily as a result of the prevalence of such drug-related activity, the Secretary may (at the discretion of the Secretary and subject to the availability of appropriations for contract amendments for this purpose), on a project by project basis, provide adjustments to the maximum monthly rents, to a level no greater than 120 percent of the project rents, to cover the costs of maintenance, security, capital repairs, and reserves required for the owner to carry out a strategy acceptable to the Secretary for addressing the problem of drug-related criminal activity. Any rent comparability standard required under this paragraph may be waived by the Secretary to so implement the preceding sentence. The Secretary may (at the discretion of the Secretary and subject to the availability of appropriations for contract amendments), on a project by project basis for projects receiving project-based assistance, provide adjustments to the maximum monthly rents to cover the costs of evaluating and reducing lead-based paint hazards, as defined in section 4851b of this title.

A26

(C) Adjustments in the maximum rents under subparagraphs (A) and (B) shall not result in material differences between the rents charged for assisted units and unassisted units of similar quality, type, and age in the same market area, as determined by the Secretary. In implementing the limitation established under the preceding sentence, the Secretary shall establish regulations for conducting comparability studies for projects where the Secretary has reason to believe that the application of the formula adjustments under subparagraph (A) would result in such material differences. The Secretary shall conduct such studies upon the request of any owner of any project, or as the Secretary determines to be appropriate by establishing, to the extent practicable, a modified annual adjustment factor for such market area, as the Secretary shall designate, that is geographically smaller than the applicable housing area used for the establishment of the annual adjustment factor under subparagraph (A). The Secretary shall establish such modified annual adjustment factor on the basis of the results of a study conducted by the Secretary of the rents charged, and any change in such rents over the previous year, for assisted units and unassisted units of similar quality, type, and age in the smaller market area. Where the Secretary determines that such modified annual adjustment factor cannot be established or that such factor when applied to a particular project would result in material differences between the rents charged for assisted units and unassisted units of similar quality, type, and age in the same market area, the Secretary may apply an alternative methodology for conducting comparability studies in order to establish rents that are not materially different from rents charged for comparable unassisted units. If the Secretary or appropriate State agency does not complete and submit to the project owner a comparability study not later than 60 days before the anniversary date of the assistance contract under this section, the automatic annual adjustment factor shall be applied. The Secretary may not reduce the contract rents in effect on or after April 15, 1987, for newly constructed, substantially rehabilitated, or moderately rehabilitated projects assisted under this section (including projects assisted under this section as in effect prior to November 30, 1983), unless the project has been refinanced in a

A27

manner that reduces the periodic payments of the owner. Any maximum monthly rent that has been reduced by the Secretary after April 14, 1987, and prior to November 7, 1988, shall be restored to the maximum monthly rent in effect on April 15, 1987. For any project which has had its maximum monthly rents reduced after April 14, 1987, the Secretary shall make assistance payments (from amounts reserved for the original contract) to the owner of such project in an amount equal to the difference between the maximum monthly rents in effect on April 15, 1987, and the reduced maximum monthly rents, multiplied by the number of months that the reduced maximum monthly rents were in effect.

(3) The amount of the monthly assistance payment with respect to any dwelling unit shall be the difference between the maximum monthly rent which the contract provides that the owner is to receive for the unit and the rent the family is required to pay under section 1437a(a) of this title. Reviews of family income shall be made no less frequently than annually.

(4) The assistance contract shall provide that assistance payments may be made only with respect to a dwelling unit under lease for occupancy by a family determined to be a lower income family at the time it initially occupied such dwelling unit, except that such payments may be made with respect to unoccupied units for a period not exceeding sixty days (A) in the event that a family vacates a dwelling unit before the expiration date of the lease for occupancy or (B) where a good faith effort is being made to fill an unoccupied unit, and, subject to the provisions of the following sentence, such payments may be made, in the case of a newly constructed or substantially rehabilitated project, after such sixty-day period in an amount equal to the debt service attributable to such an unoccupied dwelling unit for a period not to exceed one year, if a good faith effort is being made to fill the unit and the unit provides decent, safe, and sanitary housing. No such payment may be made after such sixty-day period if the Secretary determines that the dwelling unit is in a project which provides the owner with revenues exceeding the costs incurred by such owner with respect to such project.

(5) The Secretary shall take such steps as may be necessary, including the making of contracts for assistance payments in amounts in excess of the amounts required at the time of the initial renting of dwelling units, the reservation of annual contributions authority for the purpose of amending housing assistance contracts, or the allocation of a portion of new authorizations for the purpose of amending housing assistance contracts, to assure that assistance payments are increased on a timely basis to cover increases in maximum monthly rents or decreases in family incomes.

(6) Redesignated (5)

(7) Repealed. Pub.L. 105-276, Title V, § 550(a)(3)(C), Oct. 21, 1998, 112 Stat. 2609

(8)(A) Not less than one year before termination of any contract under which assistance payments are received under this section, other than a contract for tenant-based assistance under this section, an owner shall provide written notice to the Secretary and the tenants involved of the proposed termination. The notice shall also include a statement that, if the Congress makes funds available, the owner and the Secretary may agree to a renewal of the contract, thus avoiding termination, and that in the event of termination the Department of Housing and Urban Development will provide tenant-based rental assistance to all eligible residents, enabling them to choose the place they wish to rent, which is likely to include the dwelling unit in which they currently reside. Any contract covered by this paragraph that is renewed may be renewed for a period of up to 1 year or any number or years, with payments subject to the availability of appropriations for any year.

(B) In the event the owner does not provide the notice required, the owner may not evict the tenants or increase the tenants' rent payment until such time as the owner has provided the notice and 1 year has elapsed. The Secretary may allow the owner to renew the terminating contract for a period of time sufficient to give tenants 1 year of advance notice under such terms and conditions as the Secretary may require.

A29

(C) Any notice under this paragraph shall also comply with any additional requirements established by the Secretary.

(D) For purposes of this paragraph, the term "termination" means the expiration of the assistance contract or an owner's refusal to renew the assistance contract, and such term shall include termination of the contract for business reasons.

(9) Repealed. Pub.L. 113-4, Title VI, § 601(b)(2)(A), Mar. 7, 2013, 127 Stat. 107

**§ 1735f-15. Civil money penalties against multifamily mortgagors**

(a) In general

The penalties set forth in this section shall be in addition to any other available civil remedy or any available criminal penalty, and may be imposed whether or not the Secretary imposes other administrative sanctions. The Secretary may not impose penalties under this section for violations a material cause of which are the failure of the Department, an agent of the Department, or a public housing agency to comply with existing agreements.

(b) Penalty for violation of agreement as condition of transfer of physical assets, flexible subsidy loan, capital improvement loan, modification of mortgage terms, or workout agreement

    (1) Authority

    Whenever a mortgagor of property that includes 5 or more living units and that has a mortgage insured, co-insured, or held pursuant to this chapter, who has agreed in writing, as a condition of a transfer of physical assets, a flexible subsidy loan, a capital improvement loan, a modification of the mortgage terms, or a workout agreement, to use nonproject income to make cash contributions for payments due under the note and mortgage, for payments to the reserve for replacements, to restore the project to good physical condition, or to pay other project liabilities, knowingly and materially fails to comply with any of these commitments, the Secretary may impose a civil money penalty on that mortgagor, on a general partner of a partnership mortgagor, or on any officer or director of a corporate mortgagor in accordance with the provisions of this section.

    (2) Amount of penalty

    The amount of the penalty, as determined by the Secretary, for a violation of this subsection may not exceed the amount of the loss the Secretary would experience at a foreclosure sale, or a sale after foreclosure, of the property involved.

(c) Other violations

 (1)(A) Liable parties

The Secretary may also impose a civil money penalty under this section on-

   (i) any mortgagor of a property that includes 5 or more living units and that has a mortgage insured, coinsured, or held pursuant to this chapter;

   (ii) any general partner of a partnership mortgagor of such property;

   (iii) any officer or director of a corporate mortgagor;

   (iv) any agent employed to manage the property that has an identity of interest with the mortgagor, with the general partner of a partnership mortgagor, or with any officer or director of a corporate mortgagor of such property; or

   (v) any member of a limited liability company that is the mortgagor of such property or is the general partner of a limited partnership mortgagor or is a partner of a general partnership mortgagor.

 (B) Violations

A penalty may be imposed under this section upon any liable party under subparagraph (A) that knowingly and materially takes any of the following actions:

   (i) Conveyance, transfer, or encumbrance of any of the mortgaged property, or permitting the conveyance, transfer, or encumbrance of such property, without the prior written approval of the Secretary.

   (ii) Assignment, transfer, disposition, or encumbrance of any personal property of the project, including rents, other revenues, or contract rights, or paying out any funds, except for

reasonable operating expenses and necessary repairs, without the prior written approval of the Secretary.

(iii) Conveyance, assignment, or transfer of any beneficial interest in any trust holding title to the property, or the interest of any general partner in a partnership owning the property, or any right to manage or receive the rents and profits from the mortgaged property, without the prior written approval of the Secretary.

(iv) Remodeling, adding to, reconstructing, or demolishing any part of the mortgaged property or subtracting from any real or personal property of the project, without the prior written approval of the Secretary.

(v) Requiring, as a condition of the occupancy or leasing of any unit in the project, any consideration or deposit other than the prepayment of the first month's rent, plus a security deposit in an amount not in excess of 1 month's rent, to guarantee the performance of the covenants of the lease.

(vi) Not holding any funds collected as security deposits separate and apart from all other funds of the project in a trust account, the amount of which at all times equals or exceeds the aggregate of all outstanding obligations under the account.

(vii) Payment for services, supplies, or materials which exceeds $500 and substantially exceeds the amount ordinarily paid for such services, supplies, or materials in the area where the services are rendered or the supplies or materials furnished.

(viii) Failure to maintain at any time the mortgaged property, equipment, buildings, plans, offices, apparatus, devices, books, contracts, records, documents, and other related papers (including failure to keep copies of all written contracts or other instruments which affect the mortgaged property) in reasonable condition for proper audit and for examination and

inspection at any reasonable time by the Secretary or any duly authorized agents of the Secretary.

(ix) Failure to maintain the books and accounts of the operations of the mortgaged property and of the project in accordance with requirements prescribed by the Secretary.

(x) Failure to furnish the Secretary, by the expiration of the 90-day period beginning on the first day after the completion of each fiscal year (unless the Secretary has approved an extension of the 90-day period in writing), with a complete annual financial report, in accordance with requirements prescribed by the Secretary, including requirements that the report be--

> (I) based upon an examination of the books and records of the mortgagor;

> (II) prepared and certified to by an independent public accountant or a certified public accountant (unless the Secretary has waived this requirement in writing); and

> (III) certified to by the mortgagor or an authorized representative of the mortgagor.

The Secretary shall approve an extension where the mortgagor demonstrates that failure to comply with this clause is due to events beyond the control of the mortgagor.

> (xi) At the request of the Secretary, the agents of the Secretary, the employees of the Secretary, or the attorneys of the Secretary, failure to furnish monthly occupancy reports or failure to provide specific answers to questions upon which information is sought relative to income, assets, liabilities, contracts, the operation and condition of the property, or the status of the mortgage.

> (xii) Failure to make promptly all payments due under the note and mortgage, including mortgage insurance premiums, tax and insurance escrow payments, and payments to the reserve

for replacements when there is adequate project income available to make such payments.

(xiii) Failure to maintain the premises, accommodations, any living unit in the project, and the grounds and equipment appurtenant thereto in good repair and condition in accordance with regulations and requirements of the Secretary, except that nothing in this clause shall have the effect of altering the provisions of an existing regulatory agreement or federally insured mortgage on the property.

(xiv) Failure, by a mortgagor, a general partner of a partnership mortgagor, or an officer or director of a corporate mortgagor, to provide management for the project that is acceptable to the Secretary pursuant to regulations and requirements of the Secretary.

(xv) Failure to provide access to the books, records, and accounts related to the operations of the mortgaged property and of the project.

The pay out of surplus cash, as defined by and provided for in the regulatory agreement, shall not constitute a violation of this subsection.

(2) Amount of penalty

A penalty imposed for a violation under this subsection, as determined by the Secretary, may not exceed $25,000.

(d) Agency procedures

(1) Establishment

The Secretary shall establish standards and procedures governing the imposition of civil money penalties under subsections (b) and (c) of this section. These standards and procedures--

A35

(A) shall provide for the Secretary or other department official (such as the Assistant Secretary for Housing) to make the determination to impose a penalty;

(B) shall provide for the imposition of a penalty only after the mortgagor, general partner of a partnership mortgagor, officer or director of a corporate mortgagor, or identity of interest agent employed to manage the property has been given an opportunity for a hearing on the record; and

(C) may provide for review by the Secretary of any determination or order, or interlocutory ruling, arising from a hearing.

(2) Final orders

If no hearing is requested within 15 days of receipt of the notice of opportunity for hearing, the imposition of the penalty shall constitute a final and unappealable determination. If the Secretary reviews the determination or order, the Secretary may affirm, modify, or reverse that determination or order. If the Secretary does not review the determination or order within 90 days of the issuance of the determination or order, the determination or order shall be final.

(3) Factors in determining amount of penalty

In determining the amount of a penalty under subsection (b) or (c) of this section, consideration shall be given to such factors as the gravity of the offense, any history of prior offenses (including offenses occurring before December 15, 1989), ability to pay the penalty, injury to the tenants, injury to the public, benefits received, deterrence of future violations, and such other factors as the Secretary may determine in regulations to be appropriate.

(4) Reviewability of imposition of penalty

The Secretary's determination or order imposing a penalty under subsection (b) or (c) of this section shall not be subject to review, except as provided in subsection (e) of this section.

A36

(5) Payment of penalty

No payment of a civil money penalty levied under this section shall be payable out of project income.

(e) Judicial review of agency determination

(1) In general

After exhausting all administrative remedies established by the Secretary under subsection (d)(1) of this section, an entity or person against whom the Secretary has imposed a civil money penalty under subsection (b) or (c) of this section may obtain a review of the penalty and such ancillary issues as may be addressed in the notice of determination to impose a penalty under subsection (d)(1)(A) of this section in the appropriate court of appeals of the United States, by filing in such court, within 20 days after the entry of such order or determination, a written petition praying that the Secretary's order or determination be modified or be set aside in whole or in part.

(2) Objections not raised in hearing

The court shall not consider any objection that was not raised in the hearing conducted pursuant to subsection (d)(1) of this section unless a demonstration is made of extraordinary circumstances causing the failure to raise the objection. If any party demonstrates to the satisfaction of the court that additional evidence not presented at such hearing is material and that there were reasonable grounds for the failure to present such evidence at the hearing, the court shall remand the matter to the Secretary for consideration of such additional evidence.

(3) Scope of review

The decisions, findings, and determinations of the Secretary shall be reviewed pursuant to section 706 of Title 5.

(4) Order to pay penalty

A37

Notwithstanding any other provision of law, in any such review, the court shall have the power to order payment of the penalty imposed by the Secretary.

(f) Civil money penalties against multifamily mortgagors, general partners of partnership mortgagors, officers and directors of corporate mortgagors, and certain managing agents

If a mortgagor, general partner of a partnership mortgagor, officer or director of a corporate mortgagor, or identity of interest agent employed to manage the property fails to comply with the Secretary's determination or order imposing a civil money penalty under subsection (b) or (c) of this section, after the determination or order is no longer subject to review as provided by subsections (d)(1) and (e) of this section, the Secretary may request the Attorney General of the United States to bring an action in an appropriate United States district court to obtain a monetary judgment against the mortgagor, general partner of a partnership mortgagor, officer or director of a corporate mortgagor, or identity of interest agent employed to manage the property and such other relief as may be available. The monetary judgment may, in the court's discretion, include the attorneys fees and other expenses incurred by the United States in connection with the action. In an action under this subsection, the validity and appropriateness of the Secretary's determination or order imposing the penalty shall not be subject to review.

(g) Settlement by Secretary

The Secretary may compromise, modify, or remit any civil money penalty which may be, or has been, imposed under this section.

(h) "Knowingly" defined

The term "knowingly" means having actual knowledge of or acting with deliberate ignorance of or reckless disregard for the prohibitions under this section.

(i) Regulations

The Secretary shall issue such regulations as the Secretary deems appropriate to implement this section.

(j) Deposit of penalties in insurance funds

Notwithstanding any other provision of law, all civil money penalties collected under this section shall be deposited in the fund established under section 1715z-1a(j) of this title.

(k) Identity of interest managing agent

In this section, the terms "agent employed to manage the property that has an identity of interest" and "identity of interest agent" mean an entity--

    (1) that has management responsibility for a project;

    (2) in which the ownership entity, including its general partner or partners (if applicable) and its officers or directors (if applicable), has an ownership interest; and

    (3) over which the ownership entity exerts effective control.